Teresa M. CAVAZOS, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 2–982A303.

Court of Appeals of Indiana,
Second District.

Oct. 31, 1983.

James R. Fleming, Howard County Public Defender, Kokomo, for appellant.

Linley E. Pearson, Atty. Gen., Kathleen Ransom Radford, Deputy Atty. Gen., Indianapolis, for appellee.

SHIELDS, Judge.

Defendant Teresa M. Cavazos (Teresa) appeals her conviction of disorderly conduct, a class B misdemeanor, I.C. 35–45–1–3 (Burns Code Ed., Repl.1979). The sole issue on appeal is whether the evidence is sufficient to support the conviction.

We reverse.

The incident which gave rise to the charge against Teresa occurred in a tavern early in the morning of March 17, 1982. A police officer, Thomas Grider, entered the tavern where he became involved in a heated discussion with Rudy Cavazos, Teresa's brother. The discussion culminated in Rudy's arrest for disorderly conduct. Teresa was also arrested for disorderly conduct when she argued with Grider about her brother's arrest after Grider told her to be quiet.

The evidence reveals Teresa's conduct was speech. It consisted of 1) telling the officer he "had some type of grudge and no right to be arresting" her brother; 2) calling the officer an "asshole"; and 3) continuing to "debate it" [the arrest of her brother]. Record at 36. Teresa was told to be quiet between speeches one and two and between speeches two and three.[1]

■ Teresa was convicted under I.C. 35–45–1–3(2) which provides:

"A person who recklessly, knowingly, or intentionally:

. . . makes unreasonable noise and continues to do so after being asked to stop;

. . . commits disorderly conduct, a Class B misdemeanor."

Thus, the elements of disorderly conduct as charged are:

1. recklessly, knowingly, or intentionally
2. making unreasonable noise
3. which continues
4. after being asked to stop.

Consequently, there must be unreasonable noise, followed by an admonition to stop, which in turn is followed by additional unreasonable noise.

Teresa claims the evidence is insufficient because her words fell without the statutory prohibition of "unreasonable noise." The State counters with the argument her words constituted unreasonable noise because the words were "fighting words, *i.e.,* words " 'which by their very utterance, inflict injury or tend to incite an immediate breach of the peace.' " Appellee's Brief at 5 (quoting *Stults v. State,* (1975) 166 Ind. App. 461, 468, 336 N.E.2d 669, 673).

■ The State's suggestion Teresa's speech amounted to fighting words is untenable. Fighting words are "those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent action." *Cohen v. California,* (1971) 403 U.S. 15, 21, 91 S.Ct. 1780, 1786, 29 L.Ed.2d 284. By their very utterance they "inflict injury or tend to incite an immediate breach of the peace." *Stults v. State,* (1975) 166 Ind.App. 461, 468, 336 N.E.2d 669, 673 quoting *Chaplinsky v. New Hampshire,* (1942) 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031.

■ It may be a question of fact whether the words in question constitute "fighting words". However, where all reasonable persons would agree the words are not "fighting words" the question becomes one of law. Teresa's words to the effect the officer had a grudge and had no right to

---

1. Grider described the incident as follows:

"Q. What was she yelling at you?
A. At that time she said I had some type of grudge and had no right to be arresting him.
Q. Arresting Rudy Cavazos?
A. Right. I said Terry get back out of my way.

. . . . .

A. . . . As I was placing the cuffs on Rudy, Terry, Teresa came up in front of the crowd. The crowd is standing there. I got Rudy against the wall. She come up and starts yelling again why I'm arresting Rudy saying that I'm an asshole. I told her to be quiet. She's doing nothing but getting the crowd stirred up.

Q. How many times had you told her at that point in time to be quiet?
A. At least twice. I told her she was just causing more problems than what it was worth. Be quiet.
Q. What happened next?
A. She continued to debate it, so once I got Rudy under control, cuffs and everything, she was arrested also for disorderly conduct.
. . . .
Q. When she was speaking to you, was she, how high was her voice?
A. She was loud."
Record at 36–37.

arrest her brother fall within this latter category. As a matter of law these words could not reasonably provoke a listener to violent action.

Similarly, as a matter of law, the epithet "asshole" is not so inherently inflammatory that, when addressed to an ordinary citizen, it is "*inherently likely* to provoke violent action." *Cohen* (emphasis added). There was a period of time in our cultural milieu when the epithet may well have been inherently inflammatory. However, that situation no longer exists. While the word is indeed derogatory, it does not describe, reference, or characterize national origin, race, religion, sex, or parentage, categories into which fighting words now commonly fall. Further, we cannot ignore this particular epithet's common appearance in both the written and spoken language of our contemporary society, and the resultant negation of its inflammatory nature. This is not to say "asshole" is an acceptable word; rather, it is a word which reasonable persons would agree would not provoke ordinary citizens to violent action.

Moreover, even assuming a fact finder could reasonably conclude "asshole" is a "fighting word", that conclusion provides an insufficient basis for affirming Teresa's conviction because the speech which preceded the epithet "asshole" did not constitute unreasonable noise.[2] Furthermore, the speech following the epithet cannot be held to constitute unreasonable noise because the record is devoid of evidence of its content. The officer merely testified Teresa continued to "debate it". Without the specific words we cannot find that a reasonable fact finder could conclude the words of debate constituted unreasonable noise beyond a reasonable doubt.

Although other bases for affirming the trial court's judgment are not argued by the State, we have independently reviewed the evidence and conclude the judgment cannot otherwise stand.

The conduct in issue is spoken words. Spoken words, except within narrowly limited categories, fall within the constitutional guarantee of freedom of speech. Consequently, application of a disorderly conduct statute to speech must be limited to unprotected classes of speech, *e.g.* obscenity, fighting words, public nuisance speech, and incitement to imminent lawless action. *Hess v. Indiana,* (1973) 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303. This is not to say that all constitutionally unprotected speech is disorderly conduct but only that it *may* be proscribed by statutory criminalization.

Accordingly, we first examine the subject speech to determine if it falls within constitutionally unprotected categories of speech. In so doing, we emphasize that we are *assuming* and *do not decide* "unreasonable noise" as used in I.C. 35–45–1–3(2) criminalizes the foregoing categories of constitutionally unprotected speech.

Teresa's speech is not unprotected obscenity under *Roth v. United States,* (1957) 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498, and its progeny, including *Cohen v. California,* (1971) 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284. Under *Cohen,* whatever "else may be necessary to give rise to the States' broader power to prohibit obscene expression, such expression must be, in some significant way, erotic." 403 U.S. at 20, 91 S.Ct. at 1785. None of Teresa's speech was erotic or dealt "with sex in a manner appealing to prurient interest." *Roth,* 354 U.S. at 487, 77 S.Ct. at 1310.

Nor is there sufficient evidence to indicate Teresa's speech amounted to a public nuisance in that privacy interests were being invaded, another constitutionally unprotected category of speech.

"The ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is ... dependent upon a showing that substantial privacy interests are be-

---

**2.** As discussed earlier, the speech proceeding the epithet "asshole" consisted of Teresa telling the officer he "had some type of grudge and had no right to be arresting" her brother. Record at 36.

ing invaded in an essentially intolerable manner."

*Cohen,* 403 U.S. at 21, 91 S.Ct. at 1786.

The evidence reveals Teresa's speech was "loud" both before and after she was asked to be quiet. However, the evidence is insufficient to support the finding Teresa was making *unreasonable* noise. Evidence of loudness, standing by itself, does not constitute evidence of unreasonable noise in the public nuisance sense. Loudness may be unreasonable, but that determination may be made only in the context of the surrounding circumstances. Here, the only evidence of the surrounding circumstances is the existence of confusion created by her brother's scuffle and the setting of a tavern with a band approximately fifty feet away from the incident. There is no evidence Teresa was speaking any louder than anyone else, or louder than was necessary to be heard under the circumstances.

Nor is there evidence Teresa's speech was an incitement to immediate lawless action.[3] While the evidence reveals her conduct prior to the two requests to be quiet was "getting the crowd stirred up" there is no evidence her speech was "directed to inciting or producing imminent lawless action and [was] likely to incite or produce such action." *Brandenburg v. Ohio,* (1969) 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430. Given the facts of the case, it is not reasonable to infer her speech was "*directed to* " inciting immediate lawless action. The facts here are very unlike those in *State v. New,* (1981) Ind., 421 N.E.2d 626, where an attorney exhorted his client to "move him [a bystander] out of the way and cut the son of a bitch [a lock] off." 421 N.E.2d at

627. Similarly, in *Hess v. Indiana,* (1973) 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303, the defendant, while facing a crowd at an antiwar demonstration, said "We'll take the fucking street later (or again)." Here Teresa was not exhorting anyone to do anything. She was simply arguing with a policeman about whether her brother should be arrested.

Because there is insufficient evidence of probative value from which the trial court could have concluded Teresa's conduct constituted "unreasonable noise," we reverse the conviction.

Judgment reversed with instructions to enter a judgment of acquittal.

SULLIVAN, J., concurs.

BUCHANAN, C.J., dissents, with separate opinion.

BUCHANAN, Chief Judge, dissenting.

I must respectfully dissent.

Given our appellate standard of review,[1] the evidence in the trial court was clearly sufficient to support the factfinder's conclusion that Cavazos committed the offense of disorderly conduct by recklessly, knowingly, or intentionally making unreasonable noise and continuing to do so after being asked to stop. Ind.Code 35–45–1–3(2) (1982).

As the majority observes, however, this case is not that simple. I agree that Indiana's disorderly conduct statute must be carefully "construed to punish only unprotected speech and not be susceptible of an application to protected expression" under the first amendment. *Gooding v. Wilson,* (1972) 405 U.S. 518, 522, 92 S.Ct. 1103, 1106,

---

**3.** In *State v. New,* (1981) Ind., 421 N.E.2d 626, the supreme court reversed the trial court's grant of the defendant's motion to dismiss the charge of disorderly conduct brought under I.C. 35–45–1–3(2) (Burns Code Ed., Repl.1979). The supreme court held words which constitute clear incitement to violent and forceful action are not entitled to the protection of the First Amendment to the United States Constitution. However, the supreme court did not reach the issue of whether words which constitute an incitement to immediate lawless action are prohibited by I.C. 35–45–1–3(2).

**1.** We may not reweigh evidence or judge the credibility of witnesses. Considering only the evidence most favorable to the State and all reasonable inferences to be drawn therefrom, we must affirm if there is substantial evidence of probative value supporting the conclusion of the trier of fact. *Gatewood v. State,* (1982) Ind., 430 N.E.2d 781; *Moon v. State,* (1981) Ind., 419 N.E.2d 740.

31 L.Ed.2d 408. My point of departure from the majority stems from a different interpretation of Cavazos's words: In my view, she uttered "fighting words" to Officer Grider both before and after being told to stop. Therefore, Cavazos's speech was unprotected, and she was properly convicted of disorderly conduct.

Beginning with an analysis of Cavazos's use of that indelicate term "asshole," I cannot believe our culture has changed so dramatically as to depart from the 1975 holding of this court that *"personal epithets and verbal abuse ... do not enjoy constitutional protection."* *Stults v. State,* (1975) 166 Ind.App. 461, 469, 336 N.E.2d 669, 674 (emphasis supplied). The term "ass" has long been employed as a colloquialism for a stupid or foolish person,[2] but its use (or the use of any vulgar variation) does not make the word more acceptable or less "likely to provoke violent reaction." *Cohen v. California,* (1971) 403 U.S. 15, 20, 91 S.Ct. 1780, 1785, 29 L.Ed.2d 284. Remembering that the use of abusive epithets may be proscribed by the State "without a demonstration of additional justifying circumstances," *id.,* I would afford Cavazos no protection for her behavior and would rely upon *Chaplinsky v. New Hampshire,* (1942) 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031, as the landmark decision supporting that position:

> "[T]he right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words— those which by their very utterance inflict injury or tend to incite an immediate breach of the peace.... [S]uch utterances are no essential part of any exposition of ideas .... *'Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its*

> *punishment as a criminal act would raise no question under that instrument.'* "

*Id.* at 571–72, 62 S.Ct. at 768–69 (quoting *Cantwell v. Connecticut,* (1940) 310 U.S. 296, 309–10, 60 S.Ct. 900, 905–06, 84 L.Ed. 1213) (footnotes omitted; emphasis supplied).

Having concluded that Cavazos's use of this coarse word constituted "fighting words," I would observe that she was ordered to be quiet, *after* which she "continued to debate it." *Record* at 36. Such evidence permits the inference that her unreasonable noise was continuing, persistent conduct which, in my mind, satisfies the statutory and constitutional requirement for conviction.

If further analysis of Cavazos's exact language is necessary, however, the conviction should be affirmed for yet another reason: Prior to yelling the epithet at the officer, Cavazos was told to be quiet "[a]t least twice," *id.,* and the circumstances and language used which prompted the attempt to silence Cavazos demonstrate that she spoke "fighting words" even before she resorted to the use of abusive language.

"Fighting words" are those "which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Chaplinsky, supra* at 572, 62 S.Ct. at 769. Cavazos's words satisfy that definition, given the context in which they were spoken. Officer Grider was attempting to arrest a struggling man in a tavern at one o'clock in the morning. Scuffling with the man in a narrow hallway containing six or eight people, the officer found himself in a precarious position. Prompted to radio for help, Officer Grider was shoved from behind several times, and his nightstick was wrested from him. Adding to the fracas was Cavazos's harangue—she yelled at the officer, questioning his actions and asserting that her brother's arrest was based upon a "grudge" held by Grider. Such conduct was likely to prompt violent action, either on the part of Officer Grider or other members of the hostile crowd. Her words could have done nothing but worsen a situa-

2. *See* A Dictionary of Slang & Unconventional English 18, 19 (7th ed. 1970).

tion already bordering on violence. In this context, her language certainly constituted "fighting words."[3]

"The State has a legitimate interest in enforcing its . . . laws and its officers [are] entitled to enforce them free from possible interference or interruption from bystanders, even those claiming a third-party interest in the transaction." *Colten v. Kentucky,* (1972) 407 U.S. 104, 109, 92 S.Ct. 1953, 1957, 32 L.Ed.2d 584. Indiana's disorderly conduct statute was properly and constitutionally used to serve such a goal in this case.

I would affirm the conviction.

**3.** *Cf. Lewis v. New Orleans,* (1974) 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214. In *Lewis,* with facts similar to the ones before us, the majority of the Court declared unconstitutional a breach of the peace statute without deciding whether the defendant's language could be punishable under a properly limited statute. However, as Justice Blackmun observed in his dissent, the speech, uttered to a police officer, " 'plainly' was profane, 'plainly' . . . was insulting, and 'plainly' . . . was fighting." *Id.* at 136, 141, 94 S.Ct. at 973, 976 (Blackmun, J., dissenting).