**James G. GILLES, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 82A04–8804–CR–126.

Court of Appeals of Indiana, Fourth District.

Dec. 6, 1988.

Rehearing Denied Jan. 31, 1989.

On June 20, 1987, at 11:00 P.M. Gilles attempted to preach to a crowd of revellers at a "bierstube" on the grounds of the old courthouse in Evansville. The festival there included a band and alcoholic beverages. Gilles did not use amplification. He preached on the public sidewalk outside the entry to the party, preached when the band was not playing, and could be heard 25 to 30 feet from his position by 200 to 300 of the approximately 1,100 people present. Police testified Gilles addressed the crowd as "fuckers," "sinners," "whores," "queers," "drunkards," "AIDS people," and "scum of the earth," exhorted them to repent, and particularly directed some comments to four young men. Each of the three police officers testified Gilles was "loud and boisterous" and refused to stop when twice asked to do so. Some people took umbrage at Gilles's message and characterizations.

Gilles introduced into evidence and played his microcassette tape of the event. He denied using "the f-u-c-k word."

The State argued Gilles's speech was unprotected "public nuisance" speech, was loud and boisterous, and Gilles failed to stop making his noise when asked to do so. Gilles, represented by counsel below, argued he had been charged with making "unreasonable noise" and the noise he made was not unreasonable under the circumstances. Gilles argued loudness alone is not a violation of the statute. He argued he was merely exercising his right to free speech. Gilles argued the band and the crowd were louder than he was.

In rebuttal the State restated its argument Gilles's speech was unprotected public nuisance speech, was likely to produce imminent disorder, and listeners were ready to fight him.

James G. Gilles, Evansville, pro se.

Linley E. Pearson, Atty. Gen., Gary Damon Secrest, Deputy Atty. Gen., Indianapolis, for appellee.

CONOVER, Presiding Judge.

Defendant–Appellant James W. Gilles (Gilles), *pro se*, appeals his conviction for disorderly conduct, a class B misdemeanor. IND.CODE 35–45–1–3(2).[1]

We affirm.

Gilles poses several issues. Rephrased, they are:[2]

1. whether IC 35–45–1–3(2) as applied violates the free speech provisions of the state and federal constitutions; and

2. whether the evidence was sufficient to convict him.

1. 35–45–1–3. Disorderly conduct.—A person who recklessly, knowingly or intentionally:

    .     .     .     .     .

    (2) Makes unreasonable noise and continues to do so after being asked to stop; ... commits disorderly conduct, a class B misdemeanor.

2. Gilles also asks this court to determine whether IC 35–45–1–3(2) is void for vagueness or

overbreadth and whether the charging information was sufficient to apprise him of the offense charged. Gilles waived consideration of these allegations of error by failing to timely move to dismiss the indictment, *Carter v. State* (1984), Ind., 467 N.E.2d 694, 697; IC 35–34–1–4, and by failing to assert them in his motion to correct error, *Ward v. State* (1988), Ind., 519 N.E.2d 561, 562.

Review of disorderly conduct convictions based upon speech require us to look at the charged events in light of constitutional protections afforded speech. *E.g. Mesarosh v. State* (1984), Ind.App., 459 N.E.2d 426; *Cavazos v. State* (1983), Ind.App., 455 N.E.2d 618. Our courts, with consistent regularity, note in appeals challenging the sufficiency of the evidence we do not re-weigh the evidence or judge credibility of witnesses. We look only to the evidence, and reasonable inferences arising there-from, most favorable to the State. From this we determine whether there is sub-stantial evidence of probative value to support the verdict. *Pearson v. State* (1988), Ind., 523 N.E.2d 747, 749.

Gilles does not dispute the facts he acted knowingly or intentionally and refused to stop upon being asked to do so. In sum, Gilles argues his "noise" was not unreason-able in the circumstances of crowd noise and music and argues, because the noise was speech, the conviction cannot be sus-tained absent a showing of a "clear and present danger" the speech created a "sub-stantial risk of provoking violence."

The State argues Gilles's speech consti-tuted fighting words and nuisance speech, unprotected by the constitutions of the United States and the State of Indiana. The State argues the evidence showing Gilles was loudly shouting and yelling, could be heard by those at the party within a one-half block area, and could be clearly heard by police officers up to 35 feet from him shows Gilles noise was unreasonable in these circumstances. The State claims the crowd's talk and laughter and the band's music volume cannot justify or render Gilles's noise reasonable.

■ In another case involving this of-fense we said:

Despite the sweeping language of the First Amendment, the United States Su-preme Court has held several categories of "speech" fall outside the ambit of its protection. These categories include: (a) obscenity, *see generally Miller v. Cali-fornia,* (1973) 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419; (b) speech in circum-stances where its time, place or manner of delivery unduly interferes with priva-cy of the home or a similar competing interest, sometimes called "nuisance" speech, *see e.g. Kovacs v. Cooper,* (1949) 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 and *see generally* Nowak, Rotunda, Young, *Handbook on Constitutional Law* 812–17 (1978); (c) speech advocating immediate violence or similar lawless ac-tion which is likely to follow, *see general-ly Hess v. Indiana,* (1973) 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303; *Branden-burg v. Ohio,* (1969) 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430; and (d) "fighting words," personally abusive lan-guage likely to provoke a violent reaction by listeners toward the speaker, *see gen-erally Chaplinsky v. New Hampshire,* (1942) 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031, discussed *infra.*

*Mesarosh v. State* (1984), Ind.App., 459 N.E.2d 426, 427–428. *See also, Cavazos v. State* (1983), Ind.App., 455 N.E.2d 618, 620–621. It is readily apparent under these facts Gilles used "fighting words" which are not protected by First Amendment pro-hibitions. As we previously noted, the thrust of the fighting words exception has become whether, under an objective stan-dard, the words were stated as a personal insult to the hearer in language inherently likely to provoke a violent reaction.

The State argues reference to the crowd as "fuckers," "whores," "queers," and "AIDS people," and saying the people were condemned to hell qualify as fighting words. We agree. It argues comments specifically directed to four young men were also fighting words, directing us to testimony at R. 28–29.

■ Except for "the f-u-c-k word" Gilles acknowledged the words he used to ad-dress the crowd. The police officer testi-fied he used that word and it is not within our purview to weigh evidence or assess witness credibility. Words and the context in which they are spoken determine wheth-er the words fall within the category of "fighting words." To be fighting words the words must be spoken as a face-to-face personal insult. *Mesarosh v. State* (1984), Ind.App., 459 N.E.2d 426, 427–428. Gilles's

words were directed to the persons of these hearers.

The words used were of a nature to provoke violent reaction. In terms generally considered some of the most offensive in our culture, Gilles placed his listeners in categories defined by sexual activity, sexual orientation, and sexually transmitted disease. This language was inherently likely to provoke a violent reaction. These were unprotected fighting words. *Mesarosh, supra.*

■ Gilles argues the State failed to prove he acted in a loud, boisterous or disorderly manner so as to disturb the quiet of a neighborhood or family. These were the elements of disorderly conduct as it was defined when the court discussed the offense in *Whited v. State* (1971), 256 Ind. 386, 269 N.E.2d 149. The elements of the offense with which Gilles was charged are found at I.C. 35–45–1–3(2), set out in footnote one. Gilles agrees he acted knowingly and intentionally. As noted earlier, Gilles acknowledges he refused to stop when twice asked to do so. Having reviewed the words used and having concluded they were unprotected fighting words, thus unreasonable, we find no merit to Gilles's argument the evidence was insufficient.

AFFIRMED.

BUCHANAN, J., concurs.

MILLER, J., dissents with opinion.

MILLER, Judge, dissenting.

I dissent.

Mindful of my obligation not to reweigh evidence, I have listened to and have been impressed by a microcassette entered into evidence and played at trial by Gilles which he contends recorded the entire incident leading to his arrest at the June 20, 1987 Freedom Festival/Bierstube. Gilles carried a tape recorder in plain view in his breast pocket and made a recording of the Bierstube incident. Although background music and noise makes listening difficult, I believe the following constitutes a fair transcription of the recording:

"Gilles: June 20, 1987

"Crowd voice: How's everything going?

"Gilles: I'm doing just fine, how about yourself?

"Crowd voice: Great.

"Gilles: Are you drunk?

"Crowd voice: Well, I'm gettin there.

[Music and crowd noise]

"Musician: Thank you very much.

[Inaudible words from musician]

[Music and crowd noise]

"Musician: Thank you.

"Gilles: Repent you drunkards, weep and howl all you drinkers of wine for the new wine is cut off from your mouths.[1] You people here are a bunch of miserable wretched wretches. People is the scum of the earth. Drunkards, lusty perverts ... [crowd voice: Fuck you] ... and all manner of wicked wicked devil, repent and turn to Lord Jesus and he'll set you free from your drunkenness and give you life in peace and joy in the holy ghost. You bunch of drunkards. You will burn in a lake of fire unless you repent from your wicked ways. But you know what? You sinners love your sins. You love to drink booze. You love to smoke dope. You love to listen to rock and roll music. You love country music and you're wicked wicked wicked wicked. Repent. Repent. Repent.

"Crowd voice: Keep goin, dude.

[Music and crowd noise]

"Gilles: Music [over music and crowd noises]

"Gilles: Repent you lusty perverts. Most of you here are looking for nothing but an easy lay. Most of you only want a hot time tonight but don't you know that this place is filled with people with herpes simplex two, super gonorrhea three, genital warts, chlamydia you know what even "A" "I" "D" "S", AIDS. There are people here who even have AIDS tonight and you

---

**1.** Gilles testified this is a verse from the Bible, *Joel* 1:5, that he has read in years past to the Bierstube crowd at the Freedom Festival.

better watch out cause you may just get infected yourself, and if you . . .

"Police Officer: How are you doing?

"Gilles: I'm doin just fine.

"Police Officer: Did you buy yourself a uh new one?

"Gilles: I've had it about three years.

"Police Officer: What's the problem tonight?

"Gilles: I have no problem whatsoever.

"Police Officer: What's the problem is that you're creating a disturbance over here?

"Gilles: Say that again, sir.

"Police Officer: What's the problem is that you're creating a disturbance here tonight?

"Gilles: I didn't know I was creating a disturbance.

"Police Officer: You are creating a disturbance.

"Gilles: Uh, says who?

"Police Officer: Says me.

"Gilles: And who are you?

"Police Officer: The same person I was the last time that I arrested you.

"Gilles: Oh, I forgot your name.

"Police Officer: Well, when I write it down in a arrest sheet you'll have it, okay? Then you can turn that in as evidence. Now, we go through this every year so if you'll just go ahead and walk off everything will be fine. And if you want to continue to be disorderly in a public place and disrupt the activities here, then we'll place you under arrest for disorderly conduct.

"Gilles: I was out here last year preachin, nobody gave me any hassels. You were not out here last year when I was here obviously and the officer then did not deem it to be disorderly or disruptive.

"Police Officer: Well, apparently that officer didn't deem it as I deem it.

"Gilles: Correct.

"Police Officer: So, uh, like I said, if you continue to be disorderly you'll be arrested for it, so you can do whatever you want to do. It makes me no difference.

"Gilles: Okay.

"Police Officer: I'm sure you're gonna continue it so uh and you've been down there before.

"Gilles: And you know I'm not afraid of it.

"Police Officer: Well, you know I'm not afraid to arrest you for it.

"Gilles: Well, that'll probably change in the future.

"Police Officer: Well, you get your little article in the paper and another year goes by so that don't bother me any.

"Gilles: Well, you know what? I've been arrested five times in Evansville and six times might be something different.

"Police Officer: It might be, I doubt it though. It won't be any different for me.

"Gilles: You might find different.

"Police Officer: Okay, good luck to you.

[Music and crowd noises]

"Crowd voice: [inaudible]

"Gilles: It's not. By who? By who?

"Crowd voice: [inaudible]

"Gilles: This is the perfect place for it. You know why? Cause you're here.

"Crowd voice: It'll get you in jail.

"Gilles: I'll preach in jail.

"Crowd voice: [inaudible]

"Gilles: You can't even express yourself intelligently, you know that?

"Crowd voice: [inaudible]

"Gilles: Yeah and you're drunk, you're drunk, you're drunk.

"Crowd voice: Yeah, I'm drunk.

[Tape was rewound and rerecorded at this point—the next two lines were probably recorded after arrest][2]

"Gilles: I'll get you for tampering with evidence.

2. I assume this based on Gilles's testimony at trial to this effect. A policeman testified he attempted to turn off the tape recorder although he had never handled a tape recorder before.

"Police Officer: You won't get me for anything.

"Gilles: (to man in crowd) Isn't your father? Doesn't he live on Lincoln Avenue? Aren't you a Gripe? (phonetic)

"Crowd voice: [inaudible ... eat pussy ...]

"Police Officer: Step over there please.

"Gilles: Step over where?

"Police Officer: Step over there.

"Gilles: Uh, who's telling me to do that? I haven't got your name yet.

"Police Officer: You don't need my name.

"Gilles: Well how do I know who you are? You haven't identified yourself one bit.

"Police Officer: Who do you think I am?

"Gilles: You're a man about 6 foot tall.

"Police Officer: Okay, whatever you think.

"Gilles: Am I obstructing traffic on the sidewalk?

"Police Officer: Nope, but you're ready to impede your mental flow real dangerously.

"Gilles: My what flow?

"Police Officer: Your mental flow is gettin' real low.

"Gilles: Mental flow, huh? That must be a new psychological term, I don't understand it.

[Inaudible crowd noises]

"Gilles: (to man in crowd) You're a Gripe (phonetic) aren't you?

"Man in crowd: A what?

"Gilles: Gripe, your last name is Gripe?

"Man in crowd: No I'm not.

"Gilles: You're not? Okay.

"Different man in crowd: [inaudible] ... mister, what are you?

"Gilles: Repent or perish. Turn or burn. The bible tells us it is a fearful thing to fall into the hands of the living God for God is a consuming fire and he is a jealous God and he takes vengeance on his adversaries and those who mock him will not prosper.

"Police Officer: Mr. Gilles my name is Sgt. Paddock. I'm an officer of the Evansville Police Department and you are under arrest for disorderly conduct. Do you understand that? Step over here please."

\* \* \*

I note the language Gilles used is characteristic of an aggressive preacher. From listening to his voice, I also note he was at all times quite rational and never out of control. During confrontations with the policemen, his tone of voice mirrored that of the police officer he was speaking to at the time.

However, because the recording does not contain the incriminating explicatives the police officers [3] testified under oath Gilles used, I must assume the trial court believed that Gilles did not record the entire event. Or perhaps it is equally reasonable to assume the police officer rewound and rerecorded over part of the tape and inadvertently erased the explicatives in question.

Let there be no misunderstanding as to my purpose in transcribing the recording. I wish to demonstrate *the context of Gilles's speech* which is of utmost importance in our decision today. I do accept the police officers' testimony—that most favorable to the trial court's decision—and do *not* reweigh the evidence.

An element necessary to sustain a conviction for disorderly conduct/fighting words is that the words in question must be " 'directed to the person of the hearer' in the sense that they are a face to face personal insult." *Mesarosh v. State* (1984), Ind.App., 459 N.E.2d 426, 428 (citing *Cantwell v. Connecticut* (1940), 310 U.S. 296, 309, 60 S.Ct. 900, 906, 84 L.Ed. 1213).

The majority states that Gilles employed fighting words with "reference to the crowd." It goes on to say that nonspecific words were directed in particular to four

---

**3.** One policeman testified he did not recall the nature of the profanities used. Another stated Gilles used the words "fuckers, whores, fuck, hell, and damn." The policewoman testified Gilles used the words "fuckers, sinners, whores, and queers."

young men. The police officer's testimony with respect to these nonspecific words directed to the young men (referenced to by transcript page number by the majority) is as follows:

"Q. What words did he use when he addressed them?

A. Just the same general attitude, condemnation, you're going to hell, what you're doing is wrong, quoted versus [sic] from the old testament."

Mindful of our duty to enforce constitutional rights, *Mesarosh, supra.* I must conclude that the evidence is plainly insufficient to establish the "personal insult" element of the crime as charged. Simply because, as the majority noted, "[s]ome people took umbrage at Gilles's message and characterizations,"[4] Gilles's message may not be prohibited by law and punished by criminal sanctions.

Even if the evidence were sufficient to show Gilles inflicted fighting words upon someone in particular, I would, nevertheless, dissent. In *Mesarosh, supra,* we quoted the following as a partial definition of fighting words:

"[s]uch utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Id.* 459 N.E.2d at 428 (citing *Chaplinsky v. New Hampshire* (1942), 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031).

Gilles's speech was entirely in the context of an exposition of ideas; he was preaching. The context of Gilles's speech—preaching—distinguishes the case at bar from *Chaplinsky* and *Mesarosh* where personal insults were leveled at police officers making arrests.

Although Gilles's alleged profanity may not have been an "essential" part of his message, vulgar linguistic expression

serves the purpose of conveying otherwise inexpressible emotions. *Cohen v. California* (1971), 403 U.S. 15, 25, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284, *rehearing* (1971), 404 U.S. 876, 92 S.Ct. 26, 30 L.Ed.2d 124. These words are often chosen as much for their emotive as their cognitive force. As stated by Justice Harlan:

"[W]hile the particular four-letter word being litigated here is perhaps more distasteful than most others of its genre, [Cohen's jacket bore the inscription 'Fuck the Draft'] it is nevertheless often true that one man's vulgarity is another's lyric."

\* \* \* \* \* \*

"We cannot sanction the view that the Constitution, while solicitous of the cognitive content of individual speech has little or no regard for that emotive function which practically speaking, may often be the more important element of the overall message sought to be communicated." *Id.*

Under the present circumstances, the social value of Gilles's preaching as a step to the truth is not outweighed by the social interest in order and morality. The incidental use of offensive explicatives does not detract from the protection offered speech. I would reverse Gilles's conviction and instruct the trial court to enter a judgment of acquittal.

---

**4.** I note the word "some" is a relative term. It may mean the four young men, the three police officers, or any number of the crowd. "Took umbrage" is likewise not very descriptive. Neither the State nor the majority assert the State was justified in arresting Gilles as an exercise of its police power to prevent a speaker from intentionally provoking a group to violence. (as in *Feiner v. New York* (1951), 340 U.S. 315, 71 S.Ct. 303, 95 L.Ed. 295.)