2004 VT 52

[857 A.2d 287]

No. 02-504

**STATE of Vermont v. Christina M. ALLCOCK**

¶ 1. June 9, 2004. Defendant appeals from a conviction, based on a jury verdict, of disorderly conduct in violation of 13 V.S.A. § 1026(3).[1] She contends that the evidence was insufficient to support a finding that her use of abusive or "fighting words" tended to incite an immediate breach of the peace. We affirm.

¶ 2. The record evidence may be briefly summarized as follows. On January 29, 2002, defendant entered Our Place, a food shelf located in Bellows Falls. Upon entering, defendant asked an employee there if she could be served by someone other than Lisa Foster, explaining that she believed Foster had "crabs" and was sleeping with defendant's former husband. The employee conveyed defendant's concerns to Foster, who, in turn, consulted with her supervisor, Jessi Wilkins. Wilkins told Foster to return to work and invited defendant into a conference room. There, according to Wilkins, defendant reiterated her objection to Foster, stating that she "did not want Lisa . . . to do her fucking food shelf."

¶ 3. Foster recalled that as defendant emerged from the conference room "[s]he was calling me a bitch and telling me to go fuck myself, and her husband — gave her husband crabs, and fuck all of us, and then stormed out." Wilkins

---

[1] 13 V.S.A. § 1026 provides that:

A person who, with intent to cause public inconvenience, or annoyance or recklessly creating a risk thereof:

(1) Engages in fighting or in violent, tumultuous or threatening behavior; or

(2) Makes unreasonable noise; or

(3) In a public place uses abusive or obscene language; or

(4) Without lawful authority, disturbs any lawful assembly or meeting of persons; or

(5) Obstructs vehicular or pedestrian traffic, shall be imprisoned for not more than 60 days or fined not more than $500.00 or both.

recounted that, as she tried to get defendant to leave, defendant picked up books off the bookshelf and threw them across the room while continuously yelling "fuck you" at Wilkins and calling her a bitch. Defendant also picked up a box of bread and threw it into the dining room, while "telling [Wilkins] to stick it up my ass and fuck myself." Wilkins also testified that when she told defendant that she would be forced to call the police if defendant did not leave, defendant responded that she could "call the fucking police." Other people who were at the food shelf premises to receive services reacted to the incident by leaving the building.

¶ 4. Foster recounted that she did not feel threatened by defendant, but was embarrassed by being "accus[ed] . . . of transmitting a venereal disease." Wilkins also recalled that she did not fear for her physical safety, but felt that defendant did not use "appropriate language or behavior."

¶ 5. The jury returned a verdict of guilty on the charge of disorderly conduct. Defendant subsequently moved to set aside the verdict on the ground that her language did not tend to incite an immediate breach of the peace. The court denied the motion. This appeal followed.

¶ 6. In *State v. Read*, 165 Vt. 141, 148, 680 A.2d 944, 948 (1996), we limited the reach of the "abusive language" component of the disorderly conduct statute to "fighting words," i.e., spoken words which, when directed to another in a public place, "'tend to incite an immediate breach of the peace.'" *Id.* (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942)). In *Cohen v. California*, 403 U.S. 15, 20 (1971), the United States Supreme Court defined "fighting words" as "those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." It is generally acknowledged that the emphasis in *Chaplinsky*, *Cohen*, and later Supreme Court decisions was thus on the nature of the words spoken, considered in light of the surrounding circumstances, and "not on the subjective response of the actual addressee." *State v. John W.*, 418 A.2d 1097, 1104 (Me. 1980); see also *Gilles v. State*, 531 N.E.2d 220, 222 (Ind. Ct. App. 1988) (test of fighting words exception is "whether, under an objective standard, the words were stated as a personal insult to the hearer in language inherently likely to provoke a violent reaction"); *Johnson v. Palange*, 406 A.2d 360, 365 (R.I. 1979) (fighting words are those which, under "objective test . . . would cause an average person to fight"); *City of Seattle v. Camby*, 701 P.2d 499, 502 (Wash. 1985) (under objective test of fighting words, "addressee need not, in fact, be incited to breach the peace"); see also *Read*, 165 Vt. at 158, 680 A.2d at 954 (Morse, J., dissenting) ("The [fighting words] doctrine is limited to words likely to immediately provoke the individual listener to whom they are directed to start a fight. An objective standard is required to determine that issue . . . .").

¶ 7. The thrust of defendant's claim on appeal is that the evidence was insufficient to establish that defendant's words tended to incite a breach of the peace because neither Foster nor Wilkins felt threatened and neither testified that she was personally angered or incited to violence. As noted, however, fighting words are measured by an objective, not a subjective, standard. Thus, "[f]act finders need not look to the subjective response of the actual addressee," but must consider the nature of the words viewed in the totality of the circumstances. *John W.*, 418 A.2d at 1104.

¶ 8. Here, the evidence showed that, as she left the conference room, defendant directed extremely vulgar and personally offensive insults at Foster and hurled

several items around the room in a fit of anger. There was also evidence that defendant's behavior alarmed other patrons of the food shelf to the point where they felt compelled to leave. The evidence was thus sufficient to support a finding that an average person, in these circumstances, could have felt provoked to a violent reaction. See *Gilles*, 531 N.E.2d at 223 (personal insults insinuating, among other things, "sexually transmitted disease" were "inherently likely to provoke a violent reaction" and supported conviction of disorderly conduct); *State v. McCarthy*, 659 N.W.2d 808, 811 (Minn. Ct. App. 2003) (vulgar and offensive insulting words and conduct directed at individual that also aroused alarm in others sufficient to support disorderly conduct conviction). Accordingly, we conclude that the evidence, viewed in a light most favorable to the judgment, see *State v. White*, 172 Vt. 493, 497, 782 A.2d 1187, 1190 (2001), was sufficient to support the verdict.

¶ 9. Despite the dissent's position that it does not intend to "continue to war with the holding" in *Read*, it is hard to see another result. The thrust of the dissent's argument is that the intent element of the disorderly conduct statute — intent to cause public inconvenience or annoyance, or with such recklessness as to create the risk of public inconvenience or annoyance — is vague because it is not a specific intent crime. Disregarding the plain language of the statute, the dissent encourages us to "export" the Connecticut courts' "judicial gloss" on the intent element. This gloss would require proof that a defendant had the "predominant intent ... to cause inconvenience, annoyance, or harm."[2] This change does

little to clarify the intent element and, moreover, requires us to ignore the Legislature's plainly stated intent to criminalize recklessness in this context. We must presume that the Legislature — as well as the Model Penal Code drafters[3] — chose the language of the statute carefully and intentionally.

¶ 10. We also decline the dissent's urging to read the recklessness intent requirement to require a showing of "intent to provoke an immediate act of violence." We cannot agree that the disorderly conduct statute as written is overbroad if it criminalizes any conduct just short of that which prompts the hearer to an immediate violent reaction. Certainly the very notion of prohibiting disorderly conduct is to permit the state to intervene before such abusive, aggressive behavior reaches the point of violence. See *State v. James M.*, 806 P.2d 1063, 1066 (N.M. Ct. App. 1990) (finding it unreasonable to impose a requirement that a police officer wait until the hearer actually violently reacted to defendant's speech before charging disorderly conduct).

¶ 11. Finally, the dissent suggests that in our holding today we overreach and unnecessarily "criminalize speech." We find it hard to support the notion that criminalizing the rage of epithets and accusations of passing on a sexually-transmitted disease hurled by defendant at Foster constitutes the type of speech intended to be protected by the First Amendment. There are certainly instances in which the profanity and insults used by defendant would be protected speech. See e.g., *John W.*, 418 A.2d at 1108 (holding epithets directed at police officer, as a protest to arrest after officer

---

[2] We can find no cases in which other state courts have adopted Connecticut's

judicial gloss on the intent element in this context.

[3] See Model Penal Code § 250.2 (2002) and our discussion in *Read*, 165 Vt. at 147-48, 680 A.2d at 948.

refused to tell juveniles why they had been pulled over, were constitutionally protected speech); *Ware v. City & County of Denver*, 511 P.2d 475, 476 (Colo. 1973) (ruling defendant's saying "fuck you" during political speech at university was protected speech); *In re Louise C.*, 3 P.3d 1004, 1006 (Ariz. Ct. App. 1999) (holding that juvenile's use of the "F" word in dispute with principal and another student over whether student had stolen her money did not constitute fighting words). But that is not the case here.

¶ 12. As the Supreme Court has made clear, it is not only the content of the speech that is important, but the context and circumstances in which the language was used that must also be examined. *FCC v. Pacifica Found.*, 438 U.S. 726, 744-45 (1978). This was not solely the use of one profane word spoken in an effort to register disagreement or protest. It was an unprovoked, aggressive, and abusive tirade aimed personally at Foster in her workplace. The object was not, as the dissent notes, to register her protest at being removed from Our Place without any food, but rather to injure, insult, and accuse Foster of sleeping with her ex-husband and spreading venereal disease. Such behavior falls well outside free speech protection. See *In re S.J.N-K.*, 647 N.W.2d 707, 712 (S.D. 2002) (holding that student's repeated yelling "fuck you" and use of accompanying obscene gestures amounted to an "ongoing aggression" that fell outside protected free speech); *James M.*, 806 P.2d at 1066-67 (ruling defendant's repeated yelling "fuck you" while flailing arms during an argument on a public sidewalk constituted unprotected speech and was punishable disorderly conduct).

*Affirmed.*

¶ 13. **Dooley, J.,** dissenting. The difficulty that emerges when we redesign the elements of a crime to set them exactly at the line between constitutional and unconstitutional regulation is that the location of that line is more understandable to constitutional law scholars than to citizens accused of the crime. I say this not to continue to war with the holding in *State v. Read*, 165 Vt. 141, 680 A.2d 944 (1996), a decision I did not join, but instead to urge my colleagues to exercise restraint, appropriate when we criminalize speech, in applying its newly designed crime.

¶ 14. I cannot conclude that the majority has shown appropriate restraint in this decision. As a first example, although defendant is charged with disorderly conduct by use of "abusive or obscene language," 13 V.S.A. § 1026(3), both the majority and trial court rely, in part, on defendant's conduct in throwing books across the room and dropping a box of bread on the floor. Indeed, the majority shows the importance of the conduct to its decision by citing *State v. McCarthy*, 659 N.W.2d 808 (Minn. Ct. App. 2003), as one of two examples of cases that have upheld application of a constitutionally-narrowed disorderly conduct statute to similar facts. In *McCarthy*, the primary ground for finding that defendant, a parent attending his son's high school football game, engaged in disorderly conduct was that he placed his hands on the body of a referee whose call he disputed and refused to remove them. In this case, the conduct, which does not approach that in *McCarthy*, is irrelevant to the charge. If the conduct was directed at a person, and it somehow increased the chance of violent retaliation — the sole focus of the fighting words doctrine — I would understand its relevance, but the facts show no such connection.

¶ 15. My second concern arises from the mental element as found by the trial court. In *Read*, the Court distinguished the United States Supreme Court decision in *Gooding v. Wilson*, 405 U.S. 518, 518-19 (1972), which struck down a

Georgia statute that criminalized "abusive language, tending to cause a breach of the peace" because abusive language is much broader than fighting words, reasoning that the Vermont statute has "an explicit intent element." 165 Vt. at 148, 680 A.2d at 948 (the mental element "is sufficient to save the statute from a vagueness or overbreadth challenge"). *Id.* at 149, 680 A.2d at 949. But *Read* did not define what that intent element must be. Indeed, part of Justice's Morse's dissent was based on the fact that the majority left open that the mental element could be only that defendant "recklessly creat[ed] a risk of public inconvenience or annoyance," a mental element that could be shown in any case involving abusive language. *Id.* at 159, 680 A.2d at 955 (Morse, J., dissenting). Thus, it is hardly surprising that the State charged exactly the mental element Justice Morse feared would be acceptable and that is easiest to meet — that defendant "recklessly created a risk of causing public inconvenience." As a result, defendant was not charged with a specific intent crime, see *State v. Trombley*, 174 Vt. 459, 461 n.3, 807 A.2d 400, 404 n.3 (2002) (mem.) (where mental elements come from Model Penal Code categorizations, specific intent crimes are those that require knowing or purposeful action, rather than reckless action), and the mental element is more akin to negligence than to intent. See *State v. Brooks*, 163 Vt. 245, 251, 658 A.2d 22, 26-27 (1995) (difference between recklessness and negligence is one of degree). Indeed, the recklessness element is not related to fighting words, but to public inconvenience, the language that theoretically was narrowed in *Read*. In finding that the evidence was sufficient for a conviction, the trial court stressed that the mental element was recklessness.

¶ 16. I do not believe that we can square a mental element that does not involve specific intent with the consti-

tutional limits as discussed in *Read*.[4] The Court in *Read* made clear that under *Chaplinsky v. New Hampshire* a breach of the peace could be found from spoken words only if they "'tend to incite an immediate breach of the peace.'" *Read*, 165 Vt. at 148, 680 A.2d at 948 (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942)). I cannot square the immediacy and certainty of this standard with a required mental element that does not go far beyond negligence.

¶ 17. Significantly, this is the conclusion of the courts in the one state with a relevant precedent relied upon in *Read*.[5] See *State v. Weber*, 505 A.2d 1266, 1271 (Conn. App. Ct. 1986). As reflected in

---

[4] The majority has responded that the Legislature has carefully and intentionally chosen this language. I do not disagree, but find that response beside the point. The issue here, as it was in *Read*, is what elements the crime needs to withstand First Amendment challenge. *Read* added an element not found in the statute, the presence of fighting words. I believe a complementary intent element must be added.

[5] *Read* cited three main cases for its point that the intent element saves the statute from a vagueness or overbreadth challenge. 165 Vt. 141, 149, 680 A.2d 944, 949 (1996). The first, *Colten v. Kentucky*, 407 U.S. 104, 110 (1972), involved conduct, and not speech. Moreover, it described the required intent as "the intent of causing inconvenience, annoyance, or alarm," *id.*, omitting any reference to recklessness. The second, *Commonwealth v. Mastrangelo*, 414 A.2d 54, 57-58 (Pa. 1980), involved a charge that defendant breached the peace by making "unreasonable noise," a very different charge from that presented here. As discussed in the text, the one similar charge and statute is in *State v. Weber*, 505 A.2d 1266, 1271 (Conn. App. Ct. 1986).

*Read,* the court in *Weber* upheld the same statute as that before us against vagueness and overbreadth challenges because of the statutory intent requirement that could be met by reckless conduct. *Id. Weber* is not, however, the final word on the subject in Connecticut. In *State v. Indrisano,* 640 A.2d 986, 994 (Conn. 1994), the Connecticut Supreme Court placed a judicial gloss over the intent element in the breach of the peace statute regulating conduct as follows:

> To paraphrase, in order to support a conviction for disorderly conduct, the defendant's predominant intent must be to cause inconvenience, annoyance or alarm, rather than to exercise his constitutional rights.

Subsequently, in *State v. Wolff,* 678 A.2d 1369, 1389 (Conn. 1996), the court exported the same intent element into the breach of the peace statute involved in *Weber,* the same statute as is before us in this case. Under *Wolff,* the intent element for that statute is:

> "[T]he predominant intent is to cause what a reasonable person operating under contemporary community standards would consider a disturbance to or impediment of a lawful activity, a deep feeling of vexation or provocation, or a feeling of anxiety prompted by threatened danger or harm. In order to sustain a conviction for disorderly conduct, the state must begin by demonstrating that the defendant had such a state of mind."

*Id.* (quoting *Indrisano,* 640 A.2d at 995).

¶ 18. *Wolff* goes in a direction urged by a number of commentators. See T. Place, *Offensive Speech and the Pennsylvania Disorderly Conduct Statute,* 12 Temp. Pol. & Civ. Rts. L. Rev. 47, 77 (2002) (requiring a showing of "intent to provoke an immediate act of violence ... would provide speakers with fair notice of the speech proscribed by the statute and finally resolve the constitutional concerns about the statute first raised more than twenty-five years ago"); Note, *The Fighting Words Doctrine,* 93 Colum. L. Rev. 1527, 1569-70 (1993) (by requiring intent-to-provoke-violence element, the jury would be focused on what the speaker intended to accomplish rather than a person's response to the speech). I agree that we need to punish wrongful intent, rather than accepting as reasonable a violent response to speech not intended to provoke that action.

¶ 19. The trial court made no determination of the adequacy of the evidence to meet a specific intent element and stressed, by underlining the word, that only recklessness was required and that the recklessness related only to public inconvenience. Indeed, based on the jury instructions, the only intent requirement required by the trial judge was that defendant's speech "consciously disregard[ed] ... a known substantial and unjustifiable risk that her conduct will result in a public inconvenience." An "inconvenience" was defined as an "act which harasses, bothers, irritates or disturbs another person." The very limited mental element was emphasized in the State's response to defendant's motion to set aside the verdict and was the basis for the trial court's denial of that motion.

¶ 20. I cannot imagine that the mental element relied upon by the trial court would not be met in every case in which fighting words are used by a defendant. If that is an acceptable intent element, it draws seriously into question the Court's view in *Read* that the intent element answers any vagueness or overbreadth challenge. We should hold that it is inadequate, and the trial court's decision

based upon it must, at least, be reconsidered.

¶ 21. My third concern is directly related. The concept of fighting words as a constitutionally-required limitation on the disorderly conduct statute barely entered this case. The State charged that defendant was "a person who recklessly created a risk of causing public inconvenience by using abusive language in a public place." Nothing in the charge suggested that the breadth of the criminal statute had been narrowed by *Read*. Defendant made a motion to dismiss for lack of a prima facie case, citing *Read* and arguing that "[u]se of simple vulgarity in public" does not constitute fighting words. The court denied the motion stating that defendant's behavior was not protected speech and she used abusive language coupled with actions of throwing books and food across the room.

¶ 22. Nor did the jury understand the narrowed reach of the statute through the trial. Before the evidence began, the trial judge charged them that the "essential elements" of disorderly conduct were that defendant: "recklessly ... created a risk of public inconvenience ... by using abusive language ... in a public place." Only in the post-evidence charge did the trial judge reiterate the exact same elements and explained each one. With respect to abusive language, she said:

> Fourth, the State must prove that the defendant used abusive language. Abusive language can be defined as fighting words which tend to incite an immediate breach of the peace.

The decision on appeal — to uphold the verdict — was based on the limited mental element, as discussed above, and that defendant's "language, coupled with her actions, incited an immediate breach of the peace."

¶ 23. I do not find adequate either the jury instructions[6] or the court's decision on the post-verdict motion. In our recent jurisprudence we have not explicitly stated whether the trial court has discretion in deciding a motion to set aside the jury verdict and enter a judgment of acquittal. *State v. Rounds*, 104 Vt. 442, 448-49, 160 A. 249, 250 (1932), strongly suggests that the trial court has discretion in its decision and that our review of that decision is deferential. If this is the standard, the trial court clearly abused its discretion in this case. After repeating the element of the crime as abusive language, the court suggested an optional definition as fighting words. The holding of *Read* is not that fighting words are a synonym for "abusive language." Indeed, the explicit holding of *Gooding* is that they are not synonyms. After *Read*, the mandatory element of the offense is that defendant uttered fighting words, and the jury needed to be told that explicitly. It was not. Further, the short quote from *Chaplinsky* hardly conveyed that it is the expected violent reaction of the audience to the speech that makes speech fighting words, and the jury had to find that the violent reaction was likely in this case.

¶ 24. I have outlined above my difficulties with the decision with respect to the mental element of the offense and the

---

[6] Defendant has not appealed the jury instructions. It is unclear whether defense counsel objected to the jury instructions after they were delivered to the jury because the post-instruction bench conference was apparently not recorded. Defense counsel did object to part of the instructions at a charge conference. I raise the charge language because the trial court's view of the elements of the crime, as reflected in the instructions, throws doubt on the post-verdict motion decision that was appealed.

relevance of defendant's actions, for which she was not charged. Stripped of those aspects, the decision to uphold the verdict was that "her language . . . incited an immediate breach of the peace." It is easy to see from the court's decision why defendant was misdirected into arguing here that the fact that those who heard defendant's words did not react violently to them showed that she did not commit the crime. In fact, the trial court was clearly wrong; defendant's words did not "incite[] an immediate breach of the peace" as the trial court held. As a result, it is impossible to determine if the trial court used the proper standard from *Read* to reach its decision. Given the jury charge, I doubt the court used the proper standard.

¶ 25. Fourth, I am troubled by grounding a conviction for disorderly conduct primarily on the yelling of expletives. As we held in *Long v. L'Esperance*, 166 Vt. 566, 573, 701 A.2d 1048, 1053-54 (1997), expletives are not obscene. We ruled in *Long* that arresting a motorist under § 1026(3) solely because he uttered an expletive to the officer was a clear violation of the motorist's free speech rights such that the officer did not have judicial immunity. *Id.* at 574-75, 701 A.2d at 1054. As other courts have emphasized, it is not enough that the words are so offensive, obscene or abusive that they arouse resentment in others; they must be such as to immediately incite a breach of the peace. See *In re Welfare of W.A.H.*, 642 N.W.2d 41, 47 (Minn. Ct. App. 2002). Many decisions from other states involve similar fact situations where defendant yells expletives to others. See *B.E.S. v. State*, 629 So. 2d 761, 765 (Ala. Ct. Crim. App. 1993); *State v. Suiter*, 56 P.3d 775, 778 (Idaho 2002); *State v. Miller*, 673 N.E.2d 934, 937-38 (Ohio Ct. App. 1996). I find it difficult to derive a bright line rule from these decisions, especially in light of changing behavior of citizens in using such language in their everyday speech. Although we upheld the decision to convict a person who used expletives to a police officer in *Read*, the facts showed that defendant's behavior was overtly threatening and thus more likely to engender a violent response.

¶ 26. Finally, while I agree that the test is not whether defendant's conduct actually provoked a violent reaction, circumstances are very important in these cases. No case demonstrates this more than *Gilles v. State*, 531 N.E.2d 220 (Ind. Ct. App. 1988), the other major case relied upon by the majority. In *Gilles*, defendant preached to a crowd of drunken revelers outside a party, calling them many expletives related to his claim that they were the scum of the earth and spreaders of AIDS. The court rightfully found that the words were fighting words in that context. See *id.* at 222-23.

¶ 27. Here, defendant essentially threw out epithets to show her anger at being removed from the social agency without any food from the food shelf. She did not obstruct the removal, and others who heard her words reacted only by leaving, not by confronting defendant. No one was threatened, as in *Read*. A number of cases that have held that the expletives used were not fighting words have relied upon the fact that they were stated as defendant was leaving the victim of the alleged abuse. See, e.g., *Brendle v. City of Houston*, 759 So. 2d 1274, 1284 (Miss. Ct. App. 2000); *Commonwealth v. Hock*, 728 A.2d 943, 946 (Pa. 1999). That is the case here.

¶ 28. In summary, I cannot conclude that the trial court decided the motion to acquit under the correct standard, or that necessarily it should have been rejected. Having chosen this path in *Read*, we must be very sure we are following it fully in compliance with the First Amendment constraints and are setting a predictable and understandable standard. I cannot conclude that we are meet-

ing that challenge and dissent from the affirmance of the conviction in this case.

¶ 29. I am authorized to state that Justice Johnson joins in this dissent.