NOTICE:  This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports.  Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2015 VT 111

No. 2014-055

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Essex Unit, |
| | Criminal Division |
| | |
| David Tracy | March Term, 2015 |

Robert R. Bent, J.

William H. Sorrell, Attorney General, and Sarah Katz, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

Matthew F. Valerio, Defender General, Rebecca Turner, Appellate Defender, and Lauren Migliaccio, Law Clerk (On the Brief), Montpelier, for Defendant-Appellant.

PRESENT:  Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1.  **ROBINSON, J.**  Defendant David Tracy was convicted of disorderly conduct by "abusive . . . language," 13 V.S.A. § 1026(a)(3), following a heated exchange with his daughter's basketball coach.  The trial court, following a bench trial, concluded that defendant's language was not protected by the First Amendment to the United States Constitution because it constituted "fighting words."  On appeal, defendant argues that the "abusive language" prong of Vermont's disorderly-conduct statute is overbroad and impermissibly chills a substantial amount of constitutionally protected speech without serving a compelling state interest.  He further argues that, even if the statute is constitutional on its face, the speech for which he was convicted in this case is constitutionally protected.  We agree that the speech for which defendant was

convicted is beyond the reach of the abusive-language prong of the disorderly-conduct statute, and reverse the conviction.

I.

A.

¶ 2. The evidence presented at trial, viewed in the light most favorable to the State's case unless the trial court made a specific finding, reflects the following. Defendant's daughter was one of fifteen girls on a junior high school girls' basketball team. The basketball coach did not play defendant's daughter in the first two games of the season. Shortly after the end of the second game, defendant approached the coach and the coach's nineteen-year-old daughter in the school parking lot. The coach and her daughter were sitting in their car preparing to leave. The coach was in the driver's seat, and the coach's daughter was in the front passenger seat. The coach had not yet started the car. It was dark outside, but the parking lot was brightly lit.

¶ 3. Defendant parked his car, approached the coach's car, and tapped on the driver's window. Neither the coach nor the coach's daughter recognized defendant. The coach rolled the car window down about a quarter of the way and said "Hi, can I help you?" Defendant introduced himself by name and as his daughter's father, and said "I'd like to talk to you for a minute." The coach put the window the rest of the way down.

¶ 4. The coach and the coach's daughter both testified that defendant was calm at the start of the conversation, but that the exchange soon became heated and agitated. Defendant began by saying that "he just wanted to know why [the coach] wouldn't put his daughter in a game." During the next few minutes,[1] defendant was agitated and used profanity. He kept

---

[1] The coach testified that the exchange lasted "about four or five minutes," though she acknowledged that it could have been shorter. Following the trial, defendant requested a new trial on the ground that the prosecution had only just turned over a video of the incident taken from a surveillance camera mounted at the school. The trial court viewed the video in connection with defendant's motion, and noted that the video, which documents that the altercation took a little over a minute, was not fully consistent with the coach's recollection of

2

repeating, "Why can't you put her in a game for one f'ing minute?" He asked what he could do to get her in the game, called the coach "a bitch," and asked her to get out of the car and explain to his daughter why she was trying to damage her self-esteem.

¶ 5.    The exchange came to an end when the coach told defendant that it was her job as coach to do what was best for the team and not always what is best for individual wants, and that defendant's daughter was not ready to play in a game. Defendant said, "You are not the fucking NBA," and stood up and moved away from the car window.

¶ 6.    The coach said, "This conversation is over . . . You can go to the school tomorrow and file a complaint, but we're done here." The coach then rolled up her window.[2] The defendant had backed away from the coach's car before this point. As he walked away, defendant said, "This is fucking unbelievable," and "You think this is over, this will never be over."[3]

¶ 7.    For most of the confrontation, defendant was "in a squatting position, so his knees were fully bent," leaning forward with his hands in the car, but his head outside of the car near the window. The faces of the coach and defendant were about twelve to fourteen inches away from each other. The coach testified that "I wouldn't say he was shouting but he certainly had a

the time involved. However, the trial court denied defendant's motion, and the video is not in evidence. Accordingly, we accept the coach's testimony that the exchange lasted four or five minutes or less.

[2]    The coach testified that: she did not roll up the window sooner because she was worried that the window would catch defendant's arms; she did not drive back because she was afraid defendant would be injured by the car's rearview mirror; and she did not pull forward because a barrier was immediately in front of the car.

[3]    The coach and her daughter both testified that moments after defendant walked away from the coach's car, as the coach was beginning to back out, a white car, moving rapidly, passed behind her, forcing her to pull forward. To the extent the State sought to prove that defendant was driving this car, and drove at the coach's car immediately following the confrontation, the trial court made it clear in the hearing on defendant's post-trial motion that none of its decisions were based upon events involving the vehicles.

very elevated" tone, and that he was "very loud"; the coach's daughter characterized it as "yelling."

¶ 8.     The coach testified that as defendant spoke he made "a karate-chopping motion" with his right hand at her clavicle.[4]  The coach testified that the force of the movement was "quite light" at first, but became more forceful "as his voice kept rising and he became more agitated and starting cussing."  For emphasis, while talking with the coach, defendant also slammed the car with his left hand.

B.

¶ 9.     The State initially charged defendant with two misdemeanor offenses: simple assault by physical menace under 13 V.S.A. § 1023(a)(3) ("A person is guilty of simple assault if he or she . . . attempts by physical menace to put another in fear of imminent serious bodily injury") and disorderly conduct under 13 V.S.A. § 1026(a)(3) ("A person is guilty of disorderly conduct if he or she, with intent to cause public inconvenience or annoyance, or recklessly creates a risk thereof . . . in a public place, uses abusive or obscene language").[5]  After the close of evidence in the bench trial, the court allowed the State to amend its charge to include an alternative count of disorderly conduct under 13 V.S.A. § 1026(a)(1), alleging that defendant,

---

[4]  The coach also testified that defendant pulled at her coat, causing her fear.  The trial court found that "The whole idea of being grabbed and pulled through the window just doesn't . . . resonate with me.  There . . . may have been some . . . pieces of it, but it just doesn't quite resonate to the degree that's necessary for a criminal conviction."  At the hearing on the post-trial motion, the trial court reiterated that it had "discounted pretty much the concept of being pulled out of the car."  We thus do not assign significance to the State's evidence as to this alleged contact.

[5]  At the time of the charges and trial, this provision was at 13 V.S.A. § 1026(3).  In 2013, the Legislature added subsection (b) to § 1026 and re-lettered the statute accordingly.  See 2013 (Adj. Sess.), No. 150, § 3 (approved May 27, 2014, effective July 1, 2014).  No substantive change was made to the sections here at issue.  For clarity, we cite to the current version of the statute.

4

with intent to cause public inconvenience or annoyance, or recklessly creating a risk thereof "engaged in threatening behavior."[6]

¶ 10.    The trial court found defendant not guilty of the first count, charging that he attempted by physical menace to put another in fear of imminent serious bodily injury.  With respect to the newly added charge that he engaged in threatening behavior, the court concluded that the State had not proven beyond a reasonable doubt that defendant's conduct was threatening within the meaning of the statute.  The court found defendant guilty of the "abusive or obscene language" charge.  The court explained that pursuant to State v. Read, 165 Vt. 141, 680 A.2d 944 (1996), in order to qualify as abusive language, words need to be "fighting words" not subject to First Amendment protection.  The court elaborated:

> Fighting words typically are words which . . . are going to get somebody's juices up and create the risk of a response. . . . [The language used] . . . in conjunction with the repeated tapping increasing in intensity, the agitation could well fall within that category. . . . You've got this sense of agitation . . .
>
> This did turn into disorderly conduct, abusive.  And the agitation level coupled with the touching, coupled with the words, coupled with the fact it was in a public place kind of lets the court conclude that there was a risk of public inconvenience.
>
> There was a risk that . . . the complaining witness was going to do something.  In fact, she talked about maybe trying to do something like throw her car in reverse and hitting . . . the accelerator . . . and she stayed because she was worried that she was going to injure the defendant.  I mean, that's . . . descriptive of the things that we're trying to prevent through the disorderly-conduct statute. We're trying to . . . keep things from getting out of hand.

¶ 11.    After it struck its initial verdict under 13 V.S.A. § 1026(a)(3), and after considering and rejecting the newly amended charge of disorderly conduct by threatening

---

[6]  The trial court allowed this amendment following its initial verdict for defendant on the assault count, and the State on the disorderly-conduct count.  Over defendant's objection, the court struck its initial notice of verdict to consider the additional amended charge.  The court indicated that if defendant were convicted of disorderly conduct under both prongs (abusive language and threatening behavior), the State would be allowed to proceed to sentencing on only one of the two charges.

5

behavior, the court reaffirmed its verdict for the State on the charge of disorderly conduct by abusive language. The court explained:

> The Court reiterates its conclusion that this became fighting words by the use of . . . epithets including . . . "bitch," the tapping on the . . . shoulder, the escalation of anxiety. It went over the line. . . . When a parent is upset with a coach for not playing their child, it's a legitimate area of discourse between a parent and a coach.
>
> It, however, has its time and place. A dark, even lighted, but an evening parking lot in a car, you know, where you kind of get somebody cornered and then with the emotions that come out make this court conclude that we had, ultimately, disorderly conduct. It . . . kept escalating . . . until it crossed the line and I think that line was fighting words were being used.

¶ 12. Following defendant's motion for a new trial, the trial court reaffirmed its verdict without written opinion. Defendant appealed.

II.

¶ 13. On appeal, defendant makes two alternative arguments. First, defendant argues that the "abusive language" prong of the disorderly-conduct statute impermissibly chills a substantial amount of constitutionally protected speech and is facially overbroad.[7] He argues (1) that the "abusive language" prong is a content-based restriction on speech without a compelling state interest, and thus cannot survive strict scrutiny, and (2) that "fighting words" is an inherently vague and now-obsolete doctrine. In the alternative, defendant argues that even if we reject his facial challenge, the conviction must be overturned as unconstitutional as applied to him because the language and conduct at issue did not constitute fighting words. He argues that his expression here was constitutionally protected speech.

---

[7] Defendant has not made a distinct argument under the free-expression clause of the Vermont Constitution. See Vt. Const. ch. I, art. 13 ("[T]he people have a right to freedom of speech."). We thus do not address the application of state constitutional principles. See Read, 165 Vt. at 153-55, 680 A.2d at 951-52; see generally State v. Jewett, 146 Vt. 221, 500 A.2d 233 (1985).

6

¶ 14. We review de novo questions of law, including whether the statute is constitutional (facially and as applied), and whether defendant's statements constituted fighting words. "[W]e are compelled to examine for ourselves the statements in issue and the circumstances under which they are made to see whether or not they . . . are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect. . . . Because of this obligation, we cannot avoid making an independent constitutional judgment on the facts of the case." Connick v. Myers, 461 U.S. 138, 148 n.10 (1983) (quotations omitted); see also State v. Green Mountain Future, 2013 VT 87, ¶ 15, 194 Vt. 625, 86 A.3d 981 (stating, in free-speech case, that "[w]e review the trial court's conclusions of law, particularly its constitutional decisions, de novo."). We accept the trial court's findings of fact unless clearly erroneous. State v. Rheaume, 2005 VT 106, ¶ 6, 179 Vt. 39, 889 A.2d 711.

A.

¶ 15. We begin with a consideration of the First Amendment case law of the Supreme Court of the United States, which forms the backdrop for our own evolving construction of the crime of disorderly conduct by "abusive . . . language." The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. This prohibition has been incorporated against the states by operation of the Fourteenth Amendment. Thornhill v. Alabama, 310 U.S. 88, 95 (1940). The U.S. Supreme Court has consistently interpreted the First Amendment to shield a broad and expansive array of speech. Of bedrock importance is the principle that the First Amendment's protections extend beyond expressions "touching upon a matter of public concern." Connick, 461 U.S. at 147 ("The First Amendment does not protect speech and assembly only to the extent it can be characterized as political. . . . We in no sense suggest that speech on private matters . . . carries so little social value . . . that the

7

State can prohibit and punish such expression" (quotation omitted)).[8]  Put differently, "as a general matter, . . . government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." Ashcroft v. Am. Civil Liberties Union, 535 U.S. 564, 573 (2002) (quotation omitted).

¶ 16.    Equally fundamental is the principle that "the Constitution protects expression . . . without regard . . . to the truth, popularity, or social utility of the ideas and beliefs which are offered."  NAACP v. Button, 371 U.S. 415, 444-45 (1963); Baumgartner v. United States, 322 U.S. 665, 673-74 (1944) ("One of the prerogatives of American citizenship is the right to criticize . . . and that means not only informed and responsible criticism but the freedom to speak foolishly and without moderation.").  Thus, "[c]ontent-based regulations are presumptively invalid." R.A.V. v. City of St. Paul, 505 U.S. 377, 382 (1992).

¶ 17.    While the protections afforded by the First Amendment are broad, they "are not absolute," and the U.S. Supreme Court has "long recognized that the government may regulate certain categories of expression consistent with the Constitution." Virginia v. Black, 538 U.S. 343, 358 (2003).  Certain "narrow and well-defined classes of expression" are seen to carry "so little social value . . . that the State can prohibit and punish such expression." Connick, 461 U.S. at 147.[9]  In identifying classes of unprotected speech, the Court has "acknowledge[d] . . . the inherent dangers of undertaking to regulate any form of expression" and has taken care to limit

---

[8]    It is true that "where matters of purely private significance are at issue, First Amendment protections are often less rigorous." Snyder v. Phelps, 562 U.S. 443, 452 (2011). Still, the Supreme Court has defined "purely private significance" narrowly. See, e.g., Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 761-63 (1985). "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." Snyder, 562 U.S. at 453 (quotations omitted).

[9]    See also United States v. Stevens, 559 U.S. 460, 468 (2010) ("From 1791 to the present, . . . the First Amendment has permitted restrictions upon the content of speech in a few limited areas, and has never included a freedom to disregard these traditional limitations" (quotation omitted)).

8

the nature of the class accordingly. <u>Miller v. California</u>, 413 U.S. 15, 23 (1973). "[N]ew categories of unprotected speech may not be added to the list by a legislature that concludes certain speech is too harmful to be tolerated." <u>Brown v. Entm't Merchs. Ass'n</u>, 131 S. Ct. 2729, 2734 (2011).

¶ 18.    The recognized class of proscribable speech at issue here is "fighting words."[10] The fighting-words doctrine was first articulated in <u>Chaplinsky v. New Hampshire</u>, 315 U.S. 568 (1942).    There, the defendant stood on a sidewalk and told an individual: "You are a God damned racketeer" and "a damned Fascist," and "the whole government of Rochester are Fascists or agents of Fascists." 315 U.S. at 569.   The defendant was convicted of violating a statute prohibiting (in relevant part) "address[ing] any offensive, derisive or annoying word to any other person" in a public place. <u>Id</u>.   The Court upheld the conviction, concluding that "insulting or 'fighting' words"—"those which by their very utterance inflict injury or tend to incite an immediate breach of the peace"—are not constitutionally protected because "such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." <u>Id</u>. at 572.   The Court found the statute to be "narrowly drawn and limited to define and punish specific conduct lying within the domain of state power, the use in a public place of words likely to cause a breach of the peace," and that the defendant's use of epithets in his harangue were "likely to provoke the average person to retaliation, and thereby cause a breach of the peace." <u>Id</u>. at 573-74.

¶ 19.    Since <u>Chaplinsky</u>, the U.S. Supreme Court has repeatedly emphasized the breadth of the First Amendment's protection for speech that is disruptive, insulting, inciting, and

---

[10]    Other classes of unprotected speech are "obscenity, defamation, fraud, incitement, . . . speech integral to criminal conduct," <u>Stevens</u>, 559 U.S. at 468 (citations omitted), and "true threats," statements  "where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals," <u>Black</u>, 538 U.S. at 359.

inflammatory.[11]  In <u>Terminiello v. Chicago</u>, 337 U.S. 1, 2 (1949), the defendant gave a "vicious" speech to eight hundred people in an auditorium, "criticiz[ing] various political and racial groups" and condemning the thousand protestors who had gathered outside the hall in an "angry and turbulent" crowd.  The defendant was subsequently convicted under a disorderly-conduct statute prohibiting activity that "stirs the public to anger, invites dispute, brings about a condition of unrest, or creates a disturbance."  <u>Id</u>. at 3.

¶ 20.  The Court reversed, concluding that "[a] conviction resting on any of those grounds may not stand."  <u>Id</u>. at 5.  The Court noted that "[s]peech is often provocative and challenging," and may "have profound unsettling effects."  <u>Id</u>. at 4.  The provocative nature of speech, the Court found, is the very reason it is constitutionally protected: the "function of free speech under our system of government is to invite dispute.  It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger."  <u>Id</u>.  For that reason, the Court concluded that "freedom of speech, though not absolute, is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest."  <u>Id</u>. (citation omitted).[12]

---

[11]  The earliest case in this genus is arguably <u>Cantwell v. Connecticut</u>, which predated <u>Chaplinsky</u>.  In that case, a Jehovah's Witnesses proselytizer entered a heavily Catholic urban neighborhood, stopped two men on the street, got their permission to play a phonograph record, and then played a record that attacked the religion and church of the two men, who were Catholics.  310 U.S. 296, 301-03 (1940).  "Both were incensed by the contents of the record and were tempted to strike Cantwell unless he went away. On being told to be on his way he left their presence."  <u>Id</u>. at 303.  The Court reversed the disorderly conduct conviction.  While acknowledging that "the contents of the record" were highly inflammatory and "not unnaturally aroused animosity," the Court determined that the statute was not "narrowly drawn to define and punish specific conduct as constituting a clear and present danger to a substantial interest of the State" or "clear and present menace to public peace and order."  <u>Id</u>. at 311.  The Court emphasized the lack of any "assault or threatening of bodily harm," "truculent bearing," "intentional discourtesy" or "epithets or personal abuse."  <u>Id</u>. at 310.

[12]  The Court distinguished <u>Terminello</u> in <u>Feiner v. New York</u>, 340 U.S. 315 (1951). There, the defendant was convicted of disorderly conduct after delivering a loud, inflammatory,

¶ 21.    In Cohen v. California, 403 U.S. 15 (1971), the Court reversed the conviction of a defendant for disorderly conduct for walking through a courthouse corridor wearing a jacket bearing the words "Fuck the Draft."  He was charged under a statute prohibiting the "disturb(ing) the peace or quiet of any neighborhood or person, . . . by . . . offensive conduct."  Id. at 16.  The Court held that "the State may not, consistently with the First and Fourteenth Amendments, make the simple public display here involved of this single four-letter expletive a criminal offense."  Id. at 26.  The Court rejected the State's fighting-words argument because the use of the word on Cohen's jacket was "clearly not 'directed to the person of the hearer,' " and "[n]o individual actually or likely to be present could reasonably have regarded the words on appellant's jacket as a direct personal insult," and thus the word was not "inherently likely to provoke violent reaction."  Id. at 20.[13]  See also Hess v. Indiana, 414 U.S. 105, 107 (1973) (demonstrator's statement "We'll take the fucking street again," made while officers attempted to clear street, could not amount to fighting words because statement was not directed at any particular person or group of people).

¶ 22.    The year after Cohen, in Gooding v. Wilson, 405 U.S. 518, 519-20 (1972), the Court held a statute criminalizing the unprovoked use, in the presence of another, of "opprobrious words or abusive language, tending to cause a breach of the peace," to be facially vague and overbroad.  The Court explained that Chaplinsky excluded from the free-speech

racially charged sidewalk speech through a loudspeaker to a large crowd, in which the defendant exhorted one race to "rise up in arms" against another.  The crowd was ready to boil over into fights between those for and those against the speaker, and the defendant refused police officers' entreaties to cease.  Id. at 316-18.  The Court affirmed the conviction, concluding that while "[a] State may not unduly suppress free communication of views . . . under the guise of conserving desirable conditions," the speaker had "undertake[n] incitement to riot."  Id. at 320-21.  Given the imminence of "greater disorder," and the fact that defendant continued to speak after repeated requests to stop, the Court concluded that "the interest of the community in maintaining . . . public peace, order and authority" justified the conviction.  Id.

    [13]  Cohen also held that the power to constitutionally prohibit obscene expression extends only to expression that is, "in some significant way, erotic."  403 U.S. at 20.

11

protection of the First Amendment only those words that "have a direct tendency to cause acts of violence by the person to whom, individually, the remark is addressed." Id. at 523. Concluding that the Georgia courts had failed to limit the statute's reach to cases where there was a "likelihood that the person addressed would make an immediate violent response," the Court struck down the Georgia statute. Id. at 528.

¶ 23. Two years later, in Lewis v. City of New Orleans, 415 U.S. 130, 132 (1974), the Court struck down as facially overbroad a city ordinance making it unlawful "to curse or revile or to use obscene or opprobrious language toward or with reference to any member of the city police while in the actual performance of his duty." The Court concluded, "At the least, the proscription of the use of 'opprobrious language,' embraces words that do not 'by their very utterance inflict injury or tend to incite an immediate breach of the peace.' " Id. at 133. Because the Louisiana courts had not sufficiently narrowed the reach of the statute by interpretation, the Court struck down the statute on its face. Id. at 134. In a concurring opinion in Lewis, Justice Powell emphasized that "words may or may not be 'fighting words,' depending upon the circumstances of their utterance," and that "words may well . . . convey[] anger and frustration without provoking a violent reaction from the [listener]."[14] Id. at 135 (Powell, J., concurring).

¶ 24. Subsequently, the Court reiterated that only words that are likely to provoke the average person to immediate retaliation qualify as "fighting words." For example, in Texas v. Johnson, 491 U.S. 397, 409 (1989), the Court struck down a statute prohibiting the desecration of

---

[14] The courts have taken Cohen and its progeny, including Lewis, to mean that there are no "per se" fighting words, and that courts must instead assess all the relevant circumstances to determine whether the words were likely to result in an imminent violent response. See, e.g., Swartz v. Insogna, 704 F.3d 105, 111 (2d Cir. 2013) (even if "the finger" is "properly considered an obscene gesture," "such a gesture alone cannot establish probable cause to believe a disorderly conduct violation has occurred"); Sandul v. Larion, 119 F.3d 1250, 1256 (6th Cir. 1997) (it is clearly established "that the mere words and gesture 'f—k you' are constitutionally protected speech."); Downs v. State, 366 A.2d 41, 44 (Md. 1976) (same).

an American flag.  The Court specifically rejected the State's argument that "its interest in preventing breaches of the peace" rendered the statute constitutional, stating that:

> [W]e have not permitted the government to assume that every expression of a provocative idea will incite a riot, but have instead required careful consideration of the actual circumstances surrounding such expression, asking whether the expression is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.
>
> . . . .
>
> Nor does Johnson's expressive conduct fall within that small class of fighting words that are likely to provoke the average person to retaliation, and thereby cause a breach of the peace.  No reasonable onlooker would have regarded Johnson's generalized expression of dissatisfaction with the policies of the Federal Government as a direct personal insult or an invitation to exchange fisticuffs.

Id. at 409 (quotations omitted).

¶ 25.    The Court has held that, although "fighting words" may be proscribable, the State may not restrict such speech on the basis of the message communicated using fighting words. R.A.V., 505 U.S. at 391 (striking down ordinance prohibiting "fighting words" that insult or provoke violence "on the basis of race, color, creed, religion or gender").

¶ 26.    Since R.A.V., the Court has continued to reaffirm that "fighting words" are a category of unprotected speech, but has not actually applied the doctrine.[15]  In fact, in Snyder v.

---

[15]  See, e.g., United States v. Alvarez, 132 S. Ct. 2537, 2544 (2012) (listing "so-called 'fighting words' " in list of categories of expression historically subject to content-based restriction); Entm't Merchs. Ass'n, 131 S. Ct. at 2733 (including "fighting words" in list of "well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem"); Black, 538 U.S. at 359 (identifying fighting words—"those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction" as an example of speech proscribable under the First Amendment, and upholding statute prohibiting cross-burning with intent to discriminate on other grounds); Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 774 (1994) ("Absent evidence that the protesters' speech is independently proscribable (i.e., 'fighting words' or threats), or is so infused with violence as to be indistinguishable from a threat of physical harm, this provision cannot stand." (citation omitted)).

Phelps, the Court held that although a fundamentalist church's picketing of a soldier's funeral with highly inflammatory signs was "particularly hurtful" to the soldier's father—and although the demonstration's "contribution to public discourse" was "negligible"—the inflammatory picketing was protected free speech, and "cannot be restricted simply because it is upsetting or arouses contempt," or because it could fairly be termed "outrageous." 562 U.S. at 455-60. Despite the exceptionally provocative nature of the speech in question,[16] the majority made no reference to Chaplinsky or fighting words. Only the lone dissenter invoked Chaplinsky and the fighting-words doctrine in arguing for affirmance of the trial court's judgment for emotional distress and intrusion upon seclusion. Id. at 465-66 (Alito, J., dissenting).

B.

¶ 27. Our own case law concerning the scope and constitutionality of Vermont's disorderly-conduct statute has developed in parallel with these Supreme Court precedents. As written, the relevant section of the disorderly-conduct statute criminalizes the use of "abusive or obscene language" in a public place if accompanied by an intent to cause public inconvenience or recklessness with respect to that risk. 13 V.S.A. § 1026(a)(3). In State v. Read, this Court narrowed the breadth of this prohibition to conform with First Amendment limitations. 165 Vt. at 145-52, 680 A.2d at 946-51. In Read, the defendant was transported to the waiting area at a hospital emergency room after being arrested for drunken driving. The defendant then became "very uncooperative," "aggressive," "argumentative," "insulting," and "profane." In front of the arresting state trooper, patients, and hospital staff, the defendant loudly shouted, "You're a fucking piece of shit . . . You're a fucking asshole . . . I want you to get out of my face. You're dead." The defendant's "arms were flexed and rigid, his fists were clenched, his teeth were

---

[16] The signs stated, for instance: "God Hates the USA/Thank God for 9/11," "America is Doomed," "Don't Pray for the USA," "Thank God for IEDs," "Thank God for Dead Soldiers," "Pope in Hell," "Priests Rape Boys," "God Hates Fags," "You're Going to Hell," and "God Hates You." Snyder, 562 U.S. at 448.

14

grinding, and his facial expression was rigidly set." When the trooper attempted to calm the defendant and warned him that he could face criminal charges for his behavior, the defendant stated: "Go ahead, you fucking pig. You're a stupid fucking pig." Id. at 144, 680 A.2d at 946.

¶ 28. On appeal from the defendant's conviction of disorderly conduct by "abusive language," we considered the defendant's argument that the provision "is unconstitutionally vague and overbroad, in violation of the First and Fourteenth Amendments to the United States Constitution." Id. at 145, 680 A.2d at 946-47. Because "the 'abusive language' provision proscribes speech, rather than conduct," we held that "it can withstand an attack upon its facial constitutionality only if 'it is not susceptible of application to speech, although vulgar or offensive, that is [constitutionally] protected.' " Id. at 146, 680 A.2d at 947 (quoting Gooding, 405 U.S. at 520). We noted our obligation to construe statutes to avoid constitutional infirmities, "where possible," and stated that we "will not reach challenges based on facial unconstitutionality if there is a readily apparent construction [that] suggests itself as a vehicle for rehabilitating the statut[e]." Id. (quotations omitted). Consistent with this approach, we considered the scope of the First Amendment's protection of free speech and held "that the 'abusive language' provision . . . is properly construed as proscribing only 'fighting words,' " and can apply "only when a defendant's spoken words, when directed to another person in a public place, tend to incite an immediate breach of the peace," as required by Chaplinsky.[17] Id.

---

[17] We subsequently followed the same logic in narrowing the reach of a different prong of the disorderly-conduct statute in order to avoid constitutional infirmity. See State v. Colby, 2009 VT 28, ¶¶ 4-12, 185 Vt. 464, 972 A.2d 197 (construing prohibition against "disturb[ing] any lawful assembly or meeting of persons" to prohibit only "substantial impairment of the effective conduct of a meeting," objectively viewed, such that "conduct that causes a lawful meeting to terminate prematurely" or "numerous and sustained efforts to disrupt a meeting" was prohibited, but mere heckling, booing, or harsh questioning was not); see also State v. Albarelli, 2011 VT 24, ¶¶ 9, 24, 189 Vt. 293, 19 A.3d 130 (concluding that defendant's rant directed at campaign volunteers in public space is insufficient to support conviction under "threatening behavior" prong of disorderly conduct statute where defendant's actions did not "convey any intent to harm another person").

15

at 148, 680 A.2d at 948 (quotation omitted).[18] With the statute thus narrowed, we concluded that the statute was properly applied to the defendant. We reasoned that the defendant's "words, standing alone," might be "without consequence," but that they constituted fighting words in the context of an extended "tirade," directed at an individual and "shouted by an obviously intoxicated person in a hostile . . . confrontation . . . in front of a crowd of people," while the defendant was "flexing his arms, clenching his fists, and grinding his teeth." Id. at 152, 680 A.2d at 950-51 (quotation omitted).

¶ 29. Two justices dissented, taking issue with the majority's gloss on the statute as well as its application to the facts of the case. Id. at 156-59, 680 A.2d at 953-55 (Morse, J., dissenting). The dissent argued that "the 'fighting words' doctrine has become an archaic relic, which found its genesis in more chauvinistic times when it was considered bad form for a man to back down from a fight." Id. at 156, 680 A.2d at 953. The dissent noted that since Chaplinsky, the U.S. Supreme Court has "never since used the 'fighting words' doctrine to uphold a conviction." Id. The dissent argued that "to expect a person to retaliate with his fists when provoked by speech . . . runs counter to what the law should endorse." Id. Moreover, on the facts of the case, the dissent argued that the trial court misapplied the doctrine: "There is nothing in this record or common sense to suggest that even an average person would have been so provoked by defendant's behavior that [he or she] would have physically attacked defendant." Id. at 157-58, 680 A.2d at 954.

¶ 30. In Long v. L'Esperance, we considered a civil suit against a police officer for unlawful arrest brought by a plaintiff who had been arrested for disorderly conduct by "abusive

---

[18] We acknowledged in Read that the U.S. Supreme Court, in Gooding, held that the word "abusive" has "greater reach than 'fighting' words" and thus the similar disorderly-conduct statute at issue there " 'swe[pt] too broadly' by making it a crime 'merely to speak words offensive to some who hear them.' " Read, 165 Vt. at 148, 680 A.2d at 948 (quoting Gooding, 405 U.S. at 525, 527). We distinguished the Vermont statute "from the Georgia statute at issue in Gooding," however, "because the Vermont statute requires an explicit intent element." Id.

16

or obscene language" after he told an police officer at a DUI roadblock that he was irritated to have to wait "in this fucking traffic for so long." 166 Vt. 566, 569, 701 A.2d 1048, 1051 (1997). Even though the arrest took place before this Court had narrowed the reach of the abusive-language prong of the disorderly-conduct statute in Read, we concluded that the comment was protected by the First Amendment. Id. at 573-74, 701 A.2d at 1053-54. We recognized that it could not be classified as obscene because it was not designed to appeal to prurient interest. Id. at 573, 701 A.2d at 1053-54. Nor could it be considered "fighting words," as it did not "inflict injury or tend to incite an immediate breach of the peace." Id. at 573, 701 A.2d at 1053 (quotation omitted).

¶ 31. Finally, in State v. Allcock, 2004 VT 52, 177 Vt. 467, 857 A.2d 287 (mem.), a bare majority of this Court affirmed a conviction for disorderly conduct by abusive language on the following record. Upon entering a food shelf, the defendant asked if she could be served by someone other than a particular employee, explaining that she believed that the employee had "crabs" and was sleeping with the defendant's former husband. Id. ¶ 2. The defendant then said that she did not want that employee "to do her fucking food shelf." Id. Upon seeing the employee herself, the defendant called the employee "a bitch"; told her "go fuck yourself"; and made comments about the employee "g[iving] her husband crabs." Id. ¶ 3. The defendant picked up books off the bookshelf and threw them across a room "while continuously yelling 'fuck you' at [the manager] and calling her a 'bitch.' " Id. The defendant also picked up a box of bread and threw it into another room, while telling the manager "stick it up [your] ass" and "fuck [your]self." Id. Other people on the premises reacted to the incident by leaving the building. Id. The employee who was the target of the invective recounted that she did not feel threatened, but was embarrassed by being accused of transmitting a sexually transmitted disease. Id. ¶ 4.

17

¶ 32.   The majority upheld the conviction.  Id. ¶¶ 6-8.  The Court reiterated that the nature of the words spoken, considered in light of the surrounding circumstances, and not the subjective response of the actual addressee, guides the analysis of whether the words are "fighting words" beyond the protection of the First Amendment.  Id. ¶ 8 (citing Gilles v. State, 531 N.E.2d 220, 222 (Ind. Ct. App. 1988) (words are "fighting" when, "under an objective standard, the words were stated as a personal insult to the hearer in language inherently likely to provoke a violent reaction") and Johnson v. Palange, 406 A.2d 360, 365 (R.I. 1979) ("Fighting words are those which, under "objective test . . . would cause an average person to fight")); see also Read, 165 Vt. at 158, 680 A.2d at 954 (Morse, J., dissenting) ("[T]he [fighting-words] doctrine is limited to words likely to immediately provoke the individual listener to whom they are directed to start a fight.  An objective standard is required to determine that issue.").  Applying this standard, the majority concluded that the statements in question satisfied this test, emphasizing that the defendant had "directed extremely vulgar and personally offensive insults" at an employee and "hurled several items around the room in a fit of anger."  2004 VT 52, ¶ 8.

¶ 33.   The dissent took the majority to task for, among other things, relying in part on the defendant's conduct in hurling objects to uphold the conviction, when the statute that was applied targets the use of language and the majority did not draw any connection between the defendant's hurling of objects and the likelihood that her conduct would incite a violent reaction.  Id. ¶ 14 (Dooley, J., dissenting).

¶ 34.   This Court's most recent engagement with the disorderly-conduct provision criminalizing  abusive statements came in State v. Sanville, 2011 VT 34, 189 Vt. 626, 22 A.3d 450 (mem.).  There, we considered the revocation of a defendant's probation following quarrels with his landlord.  The defendant at one point suggested that he was going to burn his rental trailer down, and, on at least one occasion, said that he was going to "kick [landlord and her husband's] butts."  Id. ¶¶ 2-3.  The trial court found that the defendant had violated a probation

condition prohibiting "[v]iolent or threatening behavior," and we reversed. Id. ¶ 1. Considering whether the disorderly-conduct statute could have applied to the defendant's conduct, we specifically rejected the State's claim that the defendant's acts could have given rise to a charge of disorderly conduct for abusive or obscene language under 13 V.S.A. § 1026(a)(3), concluding that the defendant's "mouthing off" and "bluster"—however "obnoxious," "disrespectful," and "angry"—were not "sufficient behavior to violate . . . that statute." Id. ¶¶ 11-12.

C.

¶ 35. With the above history in mind, we note several important considerations that inform our analysis of § 1026(a)(3), as construed by this Court. First, this provision is not directed at violent, tumultuous, or threatening conduct. A separate prong of the disorderly-conduct statute expressly targets these categories of behavior. See 13 V.S.A. § 1026(a)(1) (prohibiting disorderly conduct by engaging in "violent, tumultuous, or threatening behavior"). Moreover, this Court has construed § 1026(a)(3) as reaching only "fighting words," a category of speech that is not synonymous with threats or tumult. Like "fighting words," statements that are "true threats" enjoy minimal First Amendment protection. "True threats" are "those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." Black, 538 U.S. at 359. Such statements may be prohibited to "protect[] individuals from the fear of violence" and "from the disruption that fear engenders," in addition to protecting people "from the possibility that the threatened violence will occur." Id. at 360 (quotation omitted). See also State v. Miles, 2011 VT 6, ¶ 8, 189 Vt. 564, 15 A.3d 596 (mem.) ("[I]n determining whether statements are true threats of physical violence unprotected by First Amendment, courts must examine speech in light of entire factual context and consider several factors, including whether [an] objectively reasonable person would view [the] message as [a] serious expression of intent to harm") (citing Doe v. Pulaski Cnty. Special Sch. Dist., 306 F.3d 616, 622-24 (8th Cir. 2002) (en banc)). By contrast,

19

as noted above, "fighting words" need not convey an intent to do harm, or instill fear in the listener; instead, they are words that are likely to so provoke the average listener that an affray will ensue. A given tirade may include both threats and fighting words, but a prosecution under § 1026(a)(3) cannot rest on the threatening character of a defendant's words or behavior. Rather, the words must meet the incitement requirement described above.[19]

¶ 36. Second, insofar as the reach of § 1026(a)(3) is constrained by the contours of the category of "fighting words," first expressly described by the U.S. Supreme Court in 1942, that category must be understood in light of that Court's evolving case law concerning the Constitution's commitment to protecting even vile, offensive, hurtful, and exceptionally insulting speech. See, e.g., Snyder, 562 U.S. at 455-60 (statements such as "Thank God for Dead Soldiers" on signs held by picketers at funeral of fallen soldier are protected speech under First Amendment); Johnson, 491 U.S. at 409 (burning of American flag could not be reasonably construed as "a direct personal insult or an invitation to exchange fisticuffs"); Terminiello, 337 U.S. at 4 ("[F]reedom of speech, though not absolute, is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest" (citation omitted)).

¶ 37. Third, in this day and age, the notion that any set of words are so provocative that they can reasonably be expected to lead an average listener to immediately respond with physical violence is highly problematic. See Read, 165 Vt. at 156, 680 A.2d at 955 (Morse, J., dissenting). In a society in which children are admonished to "use your words" rather than respond to anger and frustration by physically lashing out—and are taught the refrain, "Sticks

---

[19] In this case, the trial court concluded that the evidence could support a charge of disorderly conduct under the "threatening behavior" prong of the statute, but could not support a conviction. Accordingly, the threatening character of defendant's words and actions in this case is not before us. The question before us focuses solely on the tendency of defendant's words to incite a violent reaction from an average person in the coach's position.

and stones will break my bones, but words will never hurt me," as an appropriate response to taunts—the class of insults for which violence is a reasonably expected response, if it exists at all, is necessarily exceedingly narrow. But see Gilles, 531 N.E.2d at 222-23 (holding that preacher's reference to crowd of festivalgoers, including four specific individuals within that crowd, as " 'fuckers,' 'whores,' 'queers,' and 'AIDS people,' " and statement that people were condemned to hell, were "inherently likely to provoke a violent reaction" because he used "terms generally considered some of the most offensive in our culture . . . [to] place[] his listeners in categories defined by sexual activity, sexual orientation, and sexually transmitted disease").

¶ 38. For these reasons, if § 1026(a)(3) has any continuing force, it is necessarily exceedingly narrow in scope. The use of foul language and vulgar insults is insufficient. A likelihood of arousing animosity or inflaming anger is insufficient. The likelihood that the listener will feel an impulse to respond angrily or even forcefully is insufficient. The provision only reaches speech that, in the context in which it is uttered, is so inflammatory that it is akin to dropping a match into a pool of gasoline.

III.

¶ 39. With these considerations in mind, even assuming that § 1026(a)(3) as narrowed by this Court is constitutional, this is not a close case. Defendant's expression was vulgar, boorish, and just plain rude. His conduct could arguably have been viewed as threatening, although, as noted above, that question is not before us. But his expression cannot be said to fall in the exceedingly narrow category of statements that are reasonably expected to cause the average listener to respond with violence. Defendant in this case asked emphatically, and angrily, why the coach had not played his daughter in the basketball game. He called her a "bitch" and laced his invective with a vulgar four-letter word. But he did not lob heinous accusations against the coach, or taunt her to fight him. In fact, he uttered some of the offending statements as he walked away—rendering them especially unlikely to incite an immediate

21

violent response. See In re Welfare of S.L.J., 263 N.W.2d 412, 419-20 (Minn. 1978) (suspect's yell of "fuck you pigs" at police officers while walking away after being released by officers was not fighting words); Hershfield v. Commonwealth, 417 S.E.2d 876, 876-78 (Va. Ct. App. 1992) (vulgar comment and hand gesture made by one neighbor in front yard to neighbor two houses down was not fighting words where neighbors were separated by a fence, even though neighbor could see and hear each other). We cannot conclude on this record that an average person in the coach's position would reasonably be expected to respond to defendant's harangue with violence. For that reason, defendant's conviction of disorderly conduct by abusive language cannot stand.

¶ 40. Because we conclude that, in light of evolving First Amendment case law, defendant's conviction cannot stand even under the general framework described in Read, we do not address defendant's call for us to overrule Read and strike down § 1026(a)(3) as unconstitutional. We note, however, that for the reasons set forth above, the reach of that subsection at this point is so narrow that it is unlikely to apply in any but the most extreme circumstances.

Reversed.

FOR THE COURT:

_____

Associate Justice