22CA2213 Peo v Hughes 07-11-2024 COLORADO COURT OF APPEALS Court of Appeals No. 22CA2213 El Paso County District Court No. 14CR1962 Honorable David L. Shakes, Judge The People of the State of Colorado, Plaintiff-Appellee, v. Marshall M. Hughes, Defendant-Appellant. ORDER AFFIRMED IN PART AND REVERSED IN PART, AND CASE REMANDED WITH DIRECTIONS Division IV Opinion by JUDGE PAWAR Navarro and Johnson, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced July 11, 2024 Philip J. Weiser, Attorney General, Caitlin E. Grant, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee Frank Law Office LLC, Adam Frank, Denver, Colorado, for Defendant-Appellant 
1 ¶ 1 Defendant, Marshall M. Hughes, appeals the postconviction court’s order denying his ineffective assistance of trial and direct appeal counsel claims after a hearing. We reverse the denial of one claim, otherwise affirm, and remand the case with directions. I. Background ¶ 2 When Hughes returned from an overseas military deployment, his girlfriend, who lived in Virginia, A.B., met him in Colorado Springs. One night, they went to a bar where Hughes accused her of flirting with another patron, and they got into an argument. A.B. testified at trial that Hughes grabbed her and threw her to the ground outside the bar. When they returned to the hotel room they were staying in, Hughes destroyed the room, causing thousands of dollars in damage. ¶ 3 Over the next several months, they continued their relationship. A.B., her two-year-old daughter, and A.B.’s mother relocated to Colorado and moved in with Hughes. During this time, Hughes repeatedly accused A.B. of infidelity and repeatedly called her “whore,” “slut,” and “bitch.” ¶ 4 The prosecution charged Hughes with several offenses, including as relevant here, criminal mischief for destroying the 
2 hotel room, third degree assault for his conduct outside the bar and in the hotel room, and multiple harassment counts. ¶ 5 The jury found Hughes not guilty of third degree assault and all but one of the harassment counts. The jury found him guilty of criminal mischief and the harassment count based on section 18-9-
111(1)(h), C.R.S. 2023, for repeatedly insulting A.B. over the course of several months. ¶ 6 Hughes directly appealed his convictions, and a division of this court affirmed. People v. Hughes, slip op. at 23 (Colo. App. No. 14CA2475, Sept. 1, 2016) (not published pursuant to C.A.R. 35(e)). He then filed the Crim. P. 35(c) petition that gave rise to this appeal. In it, he alleged multiple claims of ineffective assistance of trial and direct appeal counsel. The postconviction court held an evidentiary hearing and ultimately denied all of Hughes’ claims. The claims relevant to this appeal alleged that • trial counsel was ineffective for failing to properly investigate the case and present testimony from the bouncer at the bar; • both trial and appellate counsel were ineffective for failing to challenge the sufficiency of the evidence to support the 
3 harassment conviction because Hughes’ speech was protected by the First Amendment; and • the cumulative effect of trial counsel’s deficient performance constituted ineffective assistance. ¶ 7 Hughes appeals the postconviction court’s order denying these claims. He argues that the postconviction court erred by (1) applying an incorrect legal standard to all his claims; (2) concluding that trial counsel was not ineffective for failing to call the bouncer as a witness at trial; (3) denying his claims based on the First Amendment argument as to both trial and direct appeal counsel; and (4) denying his cumulative effect claim. ¶ 8 We disagree with Hughes’ first two arguments. But we agree that the postconviction court erred by denying his First Amendment claim as to trial counsel. We therefore reverse the order denying that claim without addressing the related claim as to direct appeal counsel. Finally, we reject Hughes’ cumulative effect argument. II. Ineffective Assistance ¶ 9 To succeed on an ineffective assistance claim, the defendant must prove that (1) counsel’s performance was constitutionally deficient and (2) counsel’s deficient performance prejudiced the 
4 defense. See Strickland v. Washington, 466 U.S. 668, 687 (1984). The first prong, deficient performance, requires the defendant to prove that counsel’s representation fell below an objective standard of reasonableness. Id. at 688. This prong requires us to indulge a strong presumption that counsel’s conduct fell within the wide range of professional assistance. Id. at 689. ¶ 10 Under the second prong, prejudice, the defendant must demonstrate a reasonable probability that but for counsel’s deficient performance, the result of the proceeding would have been different. Id. at 694. Failure to prove either prong is fatal to an ineffective assistance claim, regardless of whether defendant has proved the other prong. Id. at 700. ¶ 11 We review a postconviction court’s denial of ineffective assistance claims after an evidentiary hearing as a mixed question of fact and law. See People v. Corson, 2016 CO 33, ¶ 25. We defer to the postconviction court’s factual findings if they are supported by the record. Id. But we review the court’s legal conclusions de novo, including the determinations of whether the defendant adequately proved deficient performance and prejudice. See People v. Brown, 250 P.3d 679, 681 (Colo. App. 2010). 
5 ¶ 12 With these standards in mind, we now address Hughes’ challenges to the denial of his ineffective assistance claims. III. The Legal Standard Applied by the Postconviction Court ¶ 13 We disagree with Hughes’ argument that the postconviction court applied the wrong legal standard. ¶ 14 Hughes rightly points out that while deficient performance must be proved by a preponderance of the evidence, the burden of proof for prejudice is different — and lower. Strickland, 466 U.S. at 694; People v. Washington, 2014 COA 41, ¶¶ 22-27. As mentioned above, to prove prejudice a defendant must show only that there was a reasonable probability that the result of the proceeding would have been different but for counsel’s actions. Strickland, 466 U.S. at 694; Washington, ¶ 23. Hughes argues that the postconviction court erroneously applied the higher preponderance standard in its prejudice analysis. ¶ 15 We take Hughes’ point that when setting out the governing law in its order, the postconviction court wrote that “the defendant must prove, by a preponderance of the evidence, each prong.” But the court also correctly articulated the defendant’s burden of proof for prejudice: “the defendant must demonstrate a reasonable 
6 probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” And most importantly, in its substantive discussion of Hughes’ claims, the court applied the reasonable probability standard in all its prejudice analyses. We therefore reject Hughes’ argument that the postconviction court erred by applying an incorrect legal standard. IV. Claim Based on Failure to Investigate ¶ 16 Hughes next argues that the postconviction court erred by denying his claim that trial counsel was ineffective for failing to discover and present testimony from a vital witness — the bouncer at the bar. ¶ 17 The bouncer testified at the postconviction hearing that he saw Hughes and A.B. outside the bar in an argument the night Hughes destroyed the hotel room. The bouncer described A.B. as intoxicated, belligerent, and shoving Hughes. He testified that Hughes was trying to calm her down and Hughes never put his hands on her. ¶ 18 Like the postconviction court, we conclude that there was not a reasonable probability that this testimony would have changed the outcome of the trial. The jury found Hughes not guilty of the 
7 assault, which A.B. testified occurred outside the bar. And the bouncer’s testimony did not bear directly on any other counts Hughes was convicted of (criminal mischief for destroying the hotel room and harassment for calling A.B. a bitch, whore, and slut). ¶ 19 Hughes argues otherwise, asserting that this testimony would have damaged A.B.’s credibility in general and therefore weakened her testimony that Hughes destroyed the hotel room. But A.B.’s credibility was already successfully challenged at trial. She testified that outside the bar, Hughes grabbed her by the back of the head and threw her to the ground. But on cross-examination, trial counsel confronted her with her previous statement that Hughes “never laid hands on me that night” and that she never felt threatened or intimidated that night. Thus, her credibility was already damaged, and the bouncer’s effect on her credibility would have been largely cumulative. ¶ 20 For these reasons, we conclude there was no reasonable probability that the bouncer’s testimony would have changed the outcome of trial. Hughes therefore failed to establish prejudice, and we need not address deficient performance before concluding that the postconviction court properly denied this claim. 
8 V. Claims Based on the First Amendment ¶ 21 Hughes contends that both trial and direct appeal counsel were ineffective by failing to argue that the speech underlying the harassment conviction was protected by the First Amendment. We agree with Hughes that the postconviction court erroneously denied this claim as to trial counsel. Based on this conclusion, we need not address the claim involving direct appeal counsel. ¶ 22 We begin by explaining the free speech argument that trial counsel could have made. We then explain why failing to make it constituted deficient performance that resulted in prejudice. A. Governing Law and the Free Speech Argument ¶ 23 The harassment statute Hughes was convicted under provides that a person commits harassment if, with intent to harass, annoy, or alarm another, he “[r]epeatedly insults, taunts, challenges, or makes communications in offensively coarse language to, another in a manner likely to provoke a violent or disorderly response.” § 18-9-111(1)(h). ¶ 24 Our supreme court has long since addressed the tension between this statute and the right to freedom of speech enshrined in the First Amendment of the U.S. Constitution and article 2, 
9 section 10 of the Colorado Constitution. That court held that section 18-9-111(1)(h) does not violate the constitutional right to freedom of speech because it prohibits only fighting words, and there is no constitutional right to use fighting words. People ex rel. VanMeveren v. Cnty. Ct., 191 Colo. 201, 204, 551 P.2d 716, 719 (1976). The court defined fighting words as “only those words which have a direct tendency to cause acts of violence by the persons to whom, individually, the words are addressed.” Id. ¶ 25 More recent opinions, including those from divisions of this court, have emphasized that the category of speech that can be considered fighting words is narrow and getting narrower. People in Interest of R.C., 2016 COA 166, ¶ 17 (“That the category of ‘fighting words’ has been shrinking is obvious — the Supreme Court has overturned every single fighting words conviction it has reviewed since . . . 1942.”). And these cases have reiterated that fighting words are not defined by their offensiveness or substantive reprehensibility — rather, they are defined by their tendency to 
10 provoke a violent response from the person to whom they are addressed.
1 See id. at ¶ 13. ¶ 26 Whether words meet this standard is “an objective determination.” VanMeveren, 191 Colo. at 206, 551 P.2d at 720. To satisfy this objective standard, we must ask whether the words were, “‘as a matter of common knowledge, inherently likely to provoke a violent reaction’ from a reasonable person.” R.C., ¶ 13 (quoting Coggin v. State, 123 S.W.3d 82, 90 (Tex. App. 2003)). ¶ 27 Although this is an objective determination to be made based on a reasonable person’s reaction, context matters. A fighting words determination must be made “on a case-by-case basis, considering all of the particular facts and circumstances.” Id. at ¶ 22. This context includes that society is less comfortable now 1 The prosecution argues that People in Interest of R.C., 2016 COA 166, cannot be considered in analyzing whether trial counsel’s performance was deficient because it was announced after the trial in this case. We rely on it here only for the long-established standard for what constitutes fighting words and the observation that fighting words are a narrow and shrinking category of unprotected speech. Both propositions were clearly established before R.C. was announced and before the trial in this case. See State v. Tracy, 2015 VT 111, ¶¶ 18-26 (discussing the Supreme Court’s fighting words opinions from 1942 to 2015). We therefore see no problem in relying on R.C. for these general principles. 
11 than it was when the fighting words doctrine was established over eighty years ago with the idea that mere words can move a reasonable person to physical violence. See State v. Tracy, 2015 VT 111, ¶¶ 36-37. ¶ 28 The speech at issue in this case is Hughes’ repeatedly calling A.B. a “whore,” “slut,” and “bitch.” Hughes argues that trial counsel was ineffective for failing to move for a judgment of acquittal (JOA) at the close of evidence on the ground that this speech did not rise to the level of fighting words and was therefore constitutionally protected, thereby leaving the prosecution with insufficient evidence of the harassment count. We agree and next explain why. B. Deficient Performance and Prejudice ¶ 29 To prove that trial counsel’s performance was deficient, Hughes had to overcome the presumption that the failure to move for JOA might have been sound trial strategy. See People v. Phipps, 2016 COA 190M, ¶ 17. But we can discern no strategic reason not to move for JOA on the ground explained above. ¶ 30 We recognize that trial counsel testified at the postconviction hearing that he made a strategic decision to not raise this free 
12 speech defense earlier at trial. Trial counsel explained that if he argued that Hughes’ speech was unlikely to elicit a violent response from A.B., the prosecution might have called a domestic violence expert to testify about how domestic violence victims react to verbal abuse. As trial counsel put it, this would have “expanded my battlefront.” ¶ 31 This was a strategic reason not to raise this defense before the close of evidence. But it is not a strategic reason for failing to move for JOA after the close of evidence — at that point, the prosecution would have been unable to call a domestic violence expert. Put simply, there was no downside to moving for JOA on the ground that Hughes’ speech was constitutionally protected. ¶ 32 The prosecution suggests that trial counsel effectively made such a motion. But trial counsel’s JOA motion did not reference the fighting words doctrine. Instead, trial counsel said only, “I would move for acquittal as to all counts. I would waive argument as to all counts with the exception of [a count not relevant to this appeal].” Such a general motion, presented without argument, did not raise the specific substantive issue on which this ineffective assistance claim is based. We therefore conclude that there was no 
13 strategic reason for trial counsel’s failure to move for JOA on the harassment count at issue here on free speech grounds. ¶ 33 Moreover, we conclude that had trial counsel made such a motion, there was a reasonable probability that it would have succeeded. ¶ 34 In general, calling a reasonable person a “whore,” “slut,” and “bitch” would not elicit an immediate violent response. These epithets are abusive, profane, and insulting. But the words themselves fall far short of inciting a reasonable person to immediate physical violence. ¶ 35 The postconviction court concluded otherwise based on the circumstances under which Hughes uttered the words. The court held that a free speech challenge “was not meritorious” because Hughes engaged in this speech “while [he] was violently destroying the hotel room, in circumstances where others heard the offensive insults, while [Hughes] was angrily flailing his hands over the victim, and causing the victim to roll up in a ball like a fetal position.” (Citations to the record omitted.) ¶ 36 Initially, we note that the first of these findings is unsupported by the record. A.B. was the only witness to the destruction of the 
14 hotel room, and she did not testify that Hughes insulted her in a manner that could have supported the harassment count during that incident. The testimony the postconviction court cited to support its finding to the contrary was as follows. Trial Counsel: And from December right around the hotel room incident all the way through March . . . that period of time was horrible for you, right? A.B.: Correct Trial Counsel: Nonstop abuse, calling you slut, whore, constantly mistrusting you, making you go back to talk to cashiers to see if you had really slept with them, right? During that period of time, [A.B.], how many times did you call the police for help? A.B.: Once. A.B. did not specifically testify that Hughes called her any name while he destroyed the hotel room — instead she testified generally that he repeatedly called her names over the course of several months. ¶ 37 Next, we question whether the record supports the postconviction court’s finding that Hughes engaged in the speech at issue while “angrily flailing his hands over [A.B.].” (Emphases added.) A.B.’s mother described an instance in which Hughes 
15 called A.B. a slut and a whore. A.B.’s mother testified that Hughes had discovered that A.B. had slept with a man in Hawaii. When asked to describe what happened after Hughes discovered this, A.B.’s mother testified, I saw her sitting on the back steps and over the top of her hands flailing. I was in the house with the baby and walked out to observe it, because I didn’t want [Hughes] to hurt [A.B.]. And he was yelling at her. He found out the truth and, you know, what a bitch she is, calling her names, and then walked into the house. I was with the baby. Walked into the house and let me know in front of my granddaughter she’s a whore. Your daughter is a slut. She sleeps around. She’s sick. She needs help. I was pretty devastated . . . . [A.B. was s]itting in the backyard rolled up in a ball. ¶ 38 This testimony supports that Hughes engaged in the speech at issue in front of people other than A.B. and that he caused A.B. to “roll up in a ball.” The testimony is ambiguous, however, as to whose hands were flailing over the top of A.B. and whether those hands were flailing “angrily.” ¶ 39 Even accepting the postconviction court’s finding that Hughes’ hands were flailing angrily over A.B., we nevertheless conclude that a JOA motion challenging the sufficiency of the evidence on First Amendment grounds was reasonably probable to succeed. The 
16 record reveals that the circumstances surrounding the speech at issue were that Hughes was a verbally abusive and distrustful partner, and his relationship with A.B. was unhealthy, perhaps even toxic. But there was no evidence that Hughes used the epithets at issue in conjunction with threats or acts of physical violence.
2 See State v. Parnoff, 186 A.3d 640, 648-49 (Conn. 2018) (defendant’s threats to retrieve a gun and “shoot” and “fucking kill” water company employees on his property were not fighting words). ¶ 40 Considered in context, Hughes’ speech was certainly abusive, derogatory, and hurtful. But fighting words are a narrow class of speech that are unprotected because they would provoke violence in an average person. Speech must go beyond being merely “abusive” or “harsh [and] insulting” to lie outside the protection of the First Amendment. Gooding v. Wilson, 405 U.S. 518, 525 (1972) (citation omitted). We conclude that in the context of a verbally abusive, toxic, and distrustful relationship with allegations of infidelity, the use of the words “whore,” “slut,” and “bitch” would not induce an 2 Although A.B. did testify that Hughes pushed her in the hallway of their home, she did not testify that Hughes used the speech at issue here during that alleged incident. Moreover, the jury found Hughes not guilty of the counts related to that alleged incident. 
17 immediate and violent response from the average person. Accordingly, these words fall short of the threshold for fighting words, and Hughes’ use of them was likely protected by the First Amendment. See, e.g., State v. Baccala, 163 A.3d 1, 13-16 (Conn. 2017) (customer calling store manager a “fat ugly bitch” and “cunt,” and telling the manager, “fuck you, you’re not a manager” was constitutionally protected speech). There was therefore a reasonable probability that a motion for JOA on the section 18-9-
111(1)(h) count would have been successful. ¶ 41 Because there was no strategic reason for failing to file a JOA motion and there was a reasonable probability the motion would have succeeded, we conclude that Hughes proved both deficient performance and prejudice as to trial counsel. In light of this conclusion, we need not address the related ineffective assistance claim as to direct appeal counsel because both claims seek the same relief: reversal of the section 18-9-111(1)(h) conviction. VI. Cumulative Error ¶ 42 Finally, Hughes argues that when all of trial counsel’s deficient performance is considered in the aggregate, it resulted in prejudice, entitling him to reversal of all his convictions. We disagree. 
18 ¶ 43 We have identified only a single instance of deficient performance: trial counsel’s failure to move for JOA on the section 18-9-111(1)(h) count. Even if we assume that trial counsel was also deficient for failing to present testimony from the bouncer, we conclude that the combined effect of that conduct did not deprive Hughes of his right to constitutionally effective assistance. VII. Disposition ¶ 44 The postconviction court’s order denying Hughes’ ineffective assistance claim based on trial counsel failing to challenge the section 18-9-111(1)(h) count is reversed. The postconviction court’s order is otherwise affirmed. The case is remanded to the postconviction court with directions to set aside Hughes’ harassment conviction and conduct whatever further proceedings might be appropriate consistent with this opinion. JUDGE NAVARRO and JUDGE JOHNSON concur.